**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Alan SHACKLEFORD,**
**Defendant-Appellant.**

No. 82–3052.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 9, 1984.
Decided June 19, 1984.

explosives in violation of 26 U.S.C. §§ 5861(d) and 5871 (1976). Defendant contends that the district court abused its discretion by admitting into evidence testimony concerning an allegedly similar instance of misconduct by defendant and by instructing the jury that it could consider the testimony relating to the prior conduct for any of the purposes listed in Rule 404(b) of the Federal Rules of Evidence. In addition, defendant maintains that the government failed to prove beyond a reasonable doubt that defendant possessed unregistered explosives and to establish a proper chain of custody for the admission of the pipe bomb explosive into evidence. For the reasons we explain below, we accept defendant's first assignment of error but reject the others.

## I.

The government based its case principally on the testimony of Alan Eames. Eames testified that in 1977 defendant "fronted" hashish and cocaine to him while Eames was living in Danville, Illinois. As a result of this transaction, Eames incurred a debt of some $2,000, which was to be paid off as Eames sold the drugs. Eames moved to New Orleans, however, without paying for the drugs, and did not return to Illinois until 1980, when he settled in Peoria. About a month before he returned, Eames had received a telephone call from defendant asking about the debt, and was questioned again about the debt after his move back when he inadvertently encountered defendant at a bar in Pekin, Illinois. During their conversation there defendant told Eames to get some money together. Eames next spoke with defendant in November or December of 1981, when defendant called him and suggested that Eames sell some "C–3" plastic explosives that defendant had to pay off the debt. Then, in May, 1982, at the Gazebo bar in Peoria, Eames encountered defendant once more. This time defendant told Eames that he was working with some people out of Chicago who were concerned about the outstanding debt. Defendant told Eames he

Michael W. Sonnemaker, Sonnemaker, Sonnemaker & Vespa, Peoria, Ill., for plaintiff-appellee.

Mark D. Stuaan, Asst. U.S. Atty., Gerald D. Fines, U.S. Atty., Peoria, Ill., for defendant-appellant.

Before CUMMINGS, Chief Judge, and WOOD and COFFEY, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Defendant-appellant Alan Shackleford appeals his convictions for attempting to collect a debt by the use of extortionate means in violation of 18 U.S.C. § 894 (1976) and for knowingly possessing unregistered

did not want to look bad and indicated that the debt should be paid off as soon as possible. Shortly thereafter, defendant telephoned Eames and told Eames he was lucky defendant had not sliced Eames' throat at the bar and that Eames' life was in danger if he failed to come up with the money.

A day or two after the telephone call, defendant visited Eames at his business, Furniture Technicians, in Peoria Heights, Illinois. Defendant said he needed $1,000 in the next couple of days and looked around the shop to see if he could find anything Eames could sell to satisfy the debt. Eames told defendant that the goods were all owned by other people. Defendant then asked Eames to come to his car where defendant showed him three objects defendant described as pipe bombs. Defendant then urged Eames to come up with some money very soon or he would blow the door off the shop.

The government also called Amie Longden, Eames' girlfriend, to testify. Longden stated that she spoke with defendant at a grocery store in Peoria on May 16, 1982. Defendant allegedly told her that Eames was going to "get it," and that he had almost "gotten it" in front of the Gazebo bar.

The government then introduced testimony showing that on May 27, 1982, a bomb exploded at Furniture Technicians during the early morning hours. Expert testimony revealed that the door was blown off by high explosives in connection with some copper pipe. The next day, May 28, 1982, defendant consented to a search of his residence by the police. During the search, one of the investigating officers, Robert Lucas, found a pipe bomb in defendant's bedroom closet. Lucas testified that he could not say for certain that government exhibits 8 and 10 (copper pipe and putty-like substance) were the same items he removed from the closet, although he stated they looked identical to those he removed. Lucas also testified that he gave the items he removed to officer Hurt of the Peoria Police Department and special agent

Van Amburgh of the Bureau of Alcohol, Tobacco, and Firearms. Both of these men, who were also present at defendant's residence during the search, testified that government exhibits 8 and 10 were the items they had obtained from Lucas. Forensic analysis of the copper pipe (government exhibit 8) disclosed that it was similar to the fragments of pipe found at the site of the explosion. Tests performed on the putty-like substance (government exhibit 10) revealed that it contained an explosive material known as P.E.T.N.

The government also solicited, over defendant's objection, testimony from Timothy Davis. It is this testimony that necessarily provokes our reversal of defendant's conviction on the extortion charge. Davis testified that in August, 1981, he purchased $2,000 worth of cocaine from defendant on credit. Davis further stated that defendant later came over to his house with a wrench, seeking payment. This incident occurred nine months prior to the events charged in the extortion count of which defendant was found guilty.

The government's evidence was sharply contradicted by defendant. Defendant maintained that he never provided Eames with drugs, that Eames never owed him any drug money, and that he never threatened Eames. Defendant testified that he loaned Eames about $2,000 to help Eames pay off a bad debt, but that Eames paid all but about $500 of the loan shortly thereafter. Defendant admitted seeing Eames at the bar in Pekin, Illinois, but claimed they mainly talked about old times. Defendant did ask Eames about the $500 Eames still owed but made no threats. Defendant denied having any other conversations with Eames until he visited Eames' business in the middle of May. According to defendant, at that time he offered to trade off the $500 Eames owed him for some furniture cabinets. No deal was struck because Eames did not have the cabinets there that day.

As to the government's other evidence, defendant denied placing the pipe bomb in the closet in his house and having any

knowledge it was there. Defendant said he believed it had been planted. Defendant also stated that he never had any drug dealings with Davis. He testified that Davis had purchased a car from him for which Davis had not yet paid him.

Defendant was convicted by a jury on October 6, 1982, on Counts I and IV of a four count indictment. Count I charged defendant with attempting to collect an extension of credit by use of extortionate methods, namely, the threat of using an explosive device, in violation of 18 U.S.C. § 894 (1976). Count IV alleged that defendant possessed an unregistered firearm (explosive material) in violation of 26 U.S.C. §§ 5861(d) and 5871 (1976). Defendant was sentenced to eight years imprisonment on Count I; the district court suspended the sentence on Count IV, although defendant was placed on five years probation, to commence upon termination of any parole granted in connection with the sentence for Count I. The jury found defendant not guilty on Counts II and III, which alleged actual use of an explosive device in violation of 18 U.S.C. §§ 844(i) and 844(h)(1) (1976).

## II.

**A.** *Evidence of Defendant's Prior Misconduct.*

■ Defendant contends that the district court abused its discretion by failing to exclude the testimony of Timothy Davis regarding the allegedly similar instance of extortionate misconduct by defendant involving the wrench in 1981. Under Rule 404(b),[1] evidence of other acts by the defendant is not admissible to show the defendant's bad character or that the defendant, having committed another similar act, probably committed the crime charged. Evidence of extrinsic conduct is admissible under the rule, however, if it is directed

toward something other than propensity, such as motive, opportunity, intent, preparation, knowledge, identity, or absence of mistake or accident. But even if the evidence falls within one of these areas of proof, Rule 403 compels its exclusion "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R. Evid. 403. Our decisions indicate that, under the dictates of Rules 404(b) and 403, admission of evidence of prior or subsequent acts will be approved if (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue (*i.e.,* such that "the consequential fact may be inferred from the proffered evidence," 2 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 404[8] at 404–49 (1982)), (3) the evidence is clear and convincing, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *E.g., United States v. Kane,* 726 F.2d 344, 348 (7th Cir.1984); *United States v. Wormick,* 709 F.2d 454, 459 (7th Cir.1983); *see also United States v. DeJohn,* 638 F.2d 1048, 1052 n. 4 (7th Cir.1981) (slightly different concerns apply when "opportunity" is in issue). Our threshold inquiry, therefore, is to determine whether the evidence of defendant's prior dealings with Davis was directed toward establishing a matter in issue other than defendant's propensity to threaten people who owed him money.

■ The trial court admitted Davis' testimony following its denial of defendant's motion *in limine* to exclude the testimony of Tim or Alisa Davis regarding any prior acts of the defendant. At the hearing on the motion, the government made an offer of proof regarding the proposed testimony of Tim Davis. The government stated that

---

**1.** Rule 404(b) states:
(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible

for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Rule 404(b), Fed.R.Evid.

Davis would testify that during the beginning of August, 1981, he received $2,000 worth of drugs from defendant on credit. The next day, defendant came to his house carrying a wrench and demanded payment. Davis was unable to come up with the money immediately, but later borrowed $800 from his mother and paid it to defendant as partial payment of the money Davis owed. Notwithstanding this payment, defendant returned a short time later with an accomplice and removed about $3,000 worth of personal property from the Davis' home. Two days later, defendant telephoned Alisa Davis, the witness' wife, and told her that the property taken was not enough to satisfy the debt. Defendant threatened to take Alisa's mother's car and told Alisa that if Tim or his parents called the police, they would be killed.

After hearing this offer of proof and further arguments by the parties, the district court ruled that testimony regarding the initial portions of defendant's dealings with the Davises was admissible under Rules 404(b) and 403 of the Federal Rules of Evidence. The trial judge recognized the difficulties in admitting the evidence and, in the careful exercise of his discretion, although believed by us now to be erroneous, explained:

I do believe that there are significant similarities between the two incidents in part. By that I mean that the beginning of the incident involving the Davises I think is highly similar to the cases that we are involved with here. I believe that the initial contact where the threats were made in coming to the house with the wrench and threatening him is sufficiently similar under the considerations of the cases that the Court has reviewed so that the Court could properly grant the admissibility of that.

I also believe that that type of evidence could, indeed, be helpful to the

jury on such matters as motive, intent and plan. I am not convinced, however, that that same decision is true concerning the latter aspects of the contact: the portion of it concerning the taking of the property from the house, the later contact over the telephone with "better not call the police or you're dead." That kind of thing I find too dissimilar from the facts in this case—alleged facts in this case to allow its admission....

Immediately after Davis testified about the wrench incident, the district court instructed the jury that it could consider the testimony "only on the question of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." When giving its final instructions on the use of this testimony, taken from the government's tendered instruction and given over defendant's objection, the court omitted the purposes of opportunity and preparation, which it had included in its first cautionary instruction during trial. By limiting the scope of Davis' testimony about the wrench incident and giving the cautionary instructions, the trial judge reduced the probability that the evidence would be improperly considered by the jury.

Defendant argues that Davis' testimony was not admissible for any of the purposes described by the court.[2] The particular proper purpose, assuming there was one, was never alluded to by the government; nor did the government articulate an evidentiary hypothesis by which any of the purported consequential facts could be readily inferred. The jury was left to decide what the terms "motive," "intent," "plan," etc. might mean in the context of this case and whether the evidence fit into any one of these categories. The jury would have had to study Weinstein's chapter on "Relevancy and Its Limits" in order to accomplish that assignment properly.

---

2. Defendant also maintains that even if Davis' testimony were relevant for one or more of the purposes described by the court, the evidence was clearly not admissible for some of these purposes and that the court thus erred in instructing the jury that the testimony could be considered for these irrelevant purposes. We need not address this contention, however, because we believe that the prior act evidence was not relevant to any matter in issue and thus it should have been excluded.

*See* 2 J. Weinstein & M. Berger, *supra,* Article IV.

The government concedes that because of the nature of the case, knowledge and absence of mistake or accident were not relevant matters for the jury to consider. The government in this court argues, however, that the jury could properly have considered Davis' testimony for the purposes of motive, intent, plan, or identity. We disagree. With respect to intent, that matter was never in issue. We have previously distinguished between situations in which intent is in issue because the government must show specific intent as an essential element of the crime and when intent is only a formal issue that can be inferred from the act. When the crime charged requires proof of specific intent, we have held that, because it is a material element to be proved by the government, it is necessarily in issue and the government may submit evidence of other acts in an attempt to establish the matter in its case-in-chief, assuming the other requirements of Rules 404(b) and 403 are satisfied. *E.g., United States v. Weidman,* 572 F.2d 1199, 1202 (7th Cir.1978) (since in mail fraud case specific intent to defraud must be proved, government was entitled to introduce evidence of prior similar acts even though defendant had not disputed the issue by claiming he acted innocently or mistakenly). On the other hand, we have stated that when intent is only a formal issue, so that proof of the proscribed act gives rise to an inference of intent, then unless the government has reason to believe that the defense will raise intent as an issue, evidence of other acts directed toward this issue should not be used in the government's case-in-chief and should not be admitted until the defendant raises the issue. *E.g., United States v. Fierson,* 419 F.2d 1020, 1022–23 (7th Cir.1969) ("To justify

admission into evidence of an accused's prior criminal acts to establish willfulness and intent, it is necessary that willfulness and intent be more than merely formal issues in the sense that the defendant is entitled to an instruction thereon."); *see also United States v. Fearns,* 501 F.2d 486, 491 (7th Cir.1974); *United States v. Jones,* 438 F.2d 461, 466 (7th Cir.1971). To allow intent automatically to become an issue in that class of cases in which intent is inferable from the nature of the act charged would create an exception that "would virtually swallow the rule against admission of evidence of prior misconduct." *United States v. Ring,* 513 F.2d 1001, 1009 (6th Cir.1975).

In this case, specific intent was not an essential element of the crime to be proved by the government, since defendant's intent could be inferred from proof that he threatened Eames.[3] In addition, defendant never suggested that he would raise lack of intent as a defense. He did not argue that his alleged threats were inadvertent or that he did not intend to threaten Eames. Rather, he consistently maintained throughout the trial that he never committed the acts alleged; he denied providing Eames with drugs on credit or ever threatening him.

The government's reliance on *United States v. Juarez,* 561 F.2d 65 (7th Cir.1977), is misplaced. In *Juarez,* we suggested that in some circumstances the government could use prior acts evidence in its case-in-chief to show intent before intent was formally disputed. But in *Juarez,* we had concluded not only that the offense charged—distribution of heroin—required more than a showing of general intent inferable from the act, *id.* at 72–73, but that the government in the particular circumstances of that case could not be sure from defense counsel's opening statement and

---

3. The pertinent part of the statute provides:
§ 894. Collection of extensions of credit by extortionate means
(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means
(1) to collect or attempt to collect any extension of credit, or

(2) to punish any person for the nonrepayment thereof, shall be fined not more than $10,000 or imprisoned nor more than 20 years, or both.
18 U.S.C. § 894(a) (1976).

other facts that defendant would not place intent in issue, *id.* at 73. In this case, however, it was clear from defense counsel's opening statement that defendant's position was that he loaned money to Eames as a friend, that he never sold Eames drugs or threatened him, and that the pipe bomb was probably planted by Eames in his residence. Intent was therefore only a formal issue. Under these circumstances, we believe Davis' testimony during the government's case-in-chief should not have been admitted on the theory that it was relevant to defendant's intent, since that matter was not in issue.

In addition, this case does not involve a question of the identity of the alleged extortionist. Eames did not testify that he was extorted by somebody and that he believes defendant was the extorter. Rather, the matter in issue was whether defendant did the acts complained of by Eames at all. For the prior act evidence to be relevant, therefore, it must somehow make it more likely that Eames' version of events actually took place (*i.e.,* that there was a drug debt defendant attempted to collect using extortionate means). The government suggests that because the Davis incident was similar to the act charged, Davis' testimony was admissible "to refute the defendant's contention that Eames was fabricating his identification of the defendant as a person who would threaten physical violence to collect a debt." This argument might have merit if defendant had asserted, for instance, that he was a nonviolent person and therefore could not possibly have committed the crime charged. But defendant never placed his character in issue. Defendant consistently maintained that he simply did not commit the act charged, not that he was incapable of committing such an act. Because defendant never relied on his character as a basis for his defense the government's argument becomes one grounded on propensity, and therefore cannot support the admission of the other act evidence under the rule.

Davis' testimony would be admissible if it helped to establish that defendant committed the crime by giving defendant a motive. The government contends that Davis' testimony is admissible because it "corroborates Eames' testimony that the defendant's motive in the bombing was the collection of a debt." But defendant never argued that he took part in a bombing unrelated to the purpose of collecting payment for an extension of credit. Defendant denied participating in the bombing altogether or even threatening one. In addition, Davis' testimony was not admissible on more general corroborative grounds. The testimony did not serve to buttress directly any key points of Eames' testimony, since the two events were entirely unrelated.

Perhaps if the government had evidence showing that Eames had a previous debt that he never paid to defendant until defendant resorted to threats of violence, then, since defendant admitted Eames owed him money (albeit not for drugs) but denied using threats to obtain payment, this evidence might be relevant to show that defendant was thus more likely to have used threats of force to collect a second debt from the same person, Eames. In this case, however, the question is whether defendant's previous drug loan to Davis and his appearance at Davis' house with a wrench could supply a reason why defendant might have used the threat of force to obtain payment for a drug debt owed by Eames. We think it does not. The two events are entirely unrelated. Even if the government had argued that because defendant was successful in obtaining a drug debt from Davis by using threats of violence it was therefore more likely that defendant would use extortionate means to collect a drug debt from Eames, this argument would fail for at least two reasons. First, tenuous as the argument already is, Davis' actual testimony about the prior incident never included the fact that defendant had been successful in collecting the debt from Davis only after defendant resorted to threats of violence. Indeed, as the government itself observes, "Davis was not even permitted to testify to any motive the defendant may have had in

coming with the wrench." Second, such an argument is really nothing more than saying that because defendant successfully committed a similar act earlier, he was sufficiently emboldened to have likely committed the act here. This is an argument that relies on propensity, an impermissible basis for admitting extrinsic evidence under the rule.

Finally, Davis' testimony does not tend to show a unique design or plan that would help indirectly to establish that defendant threatened Eames here. There simply is insufficient similarity between Davis' description of the prior incident and Eames' description of the later incident for any inference to be drawn regarding defendant's responsibility for the later acts. When we have admitted other acts evidence for this purpose, we have required that the collateral act have borne "a singular strong resemblance to the pattern of the offense charged." *Jones*, 438 F.2d at 466. Only when the other act shares truly distinctive features with the crime with which the defendant is charged can it support the inference that the defendant probably committed the crime. The fact that defendant had previously used threats to obtain payment for a drug debt does not support a finding that therefore he probably committed the acts alleged here. The threats as described by Davis and Eames were accomplished by different means in each instance, and there are no specific, distinctive details linking the two acts from which the jury could be asked to infer that defendant was an extortionist here. As one commentator has observed:

A defendant cannot be identified as the perpetrator of the charged act simply because he has at other times committed the same commonplace variety of criminal act except by reference to the forbidden inference of propensity. The question for the court is whether the characteristics relied upon are sufficiently idiosyncratic to permit an inference of pattern for purposes of proof.

2 J. Weinstein & M. Berger, *supra*, ¶ 404[16] at 404–93 (footnotes omitted).

We see no other grounds, and the government has not suggested any other grounds, to support admission of Davis' testimony under Rule 404(b), which is not an exclusive list. The government argues, however, that even if Davis' testimony were improperly admitted, the error was harmless. The government contends that because Davis' testimony was brief and followed by cautionary instructions, "it seems clear that the testimony played no part in the jury's verdict." We cannot agree. Our task is to gauge "what effect the error had or reasonably may be taken to have had upon the jury's decision." *United States v. Shepherd*, 576 F.2d 719, 723 (7th Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 155 (1978) (quoting *Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946)). Only if "we are convinced that 'the error did not influence the jury, or had but very slight effect,' and can say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error,' [should we] hold the error harmless." *Id.* at 723–24 (quoting *Kotteakos*, 328 U.S. at 764–65, 66 S.Ct. at 1247–48).

Here, the government's case on the extortion charge (Count I) rested entirely on the testimony of Eames, which was set against the word of defendant. The case was thus closely contested, as evidenced by the jury's decision to acquit defendant of the two more severe charges relating to the explosion. Under the circumstances, we cannot say that the introduction of Davis' testimony did not reasonably have a substantial influence of the minds of the jurors. Except in unusual circumstances, emanations from evidence of a defendant's bad acts are almost always suggestive of a defendant's propensity to commit other bad or criminal acts and tend to impugn his or her credibility, and errors in admitting such evidence consequently often go to the fundamental fairness of the trial. Unless there is other evidence that overwhelmingly establishes the defendant's guilt, we

think evidence of other acts or crimes will reasonably play a substantial role in swaying the jury. Because this is not a case in which there was an overwhelming amount of other evidence, although it was substantial, from which the government's case was completely proved without reference to the evidence of defendant's alleged involvement in a prior extortionate act, we think defendant's conviction on the extortion charge (Count I) must be reversed and the case remanded for a new trial. *E.g., United States v. Fierson,* 419 F.2d 1020, 1023 (7th Cir.1969).[4]

### B. *Defendant's Possession of Unregistered Explosives.*

■ Defendant maintains that the government failed to prove beyond a reasonable doubt that defendant knowingly possessed unregistered explosives. He argues that the record does not support a finding that he actually or constructively possessed the pipe bomb found in the bedroom closet of his residence because he never admitted possession or knowledge of the bomb and because members of his family, visitors, and Eames himself had access to that area at various times.

The government contends that defendant's argument is misconceived. It argues that defendant was not charged with possession of the pipe bomb found in his home on May 28th, but rather with possession "on or about the 27th day of May, 1982," the day of the bombing, as alleged in the indictment. Although the government acknowledges in its brief that, based on its theory of the case, the jury's guilty verdict on the possession charge could be construed as being inconsistent with the not guilty verdicts on the counts alleging actual uses of an explosive on May 27th, the government points out that this possibility

of jury confusion has never been argued by defendant, since defendant has assumed that the possession conviction related to May 28th. The government maintains that in any event the fact of the bombing on May 27th coupled with the similarity between the items found at the site of the explosion and those found at defendant's residence are enough for the jury reasonably to have inferred that defendant possessed, or had immediate access to, materials for a pipe bomb on May 27th.

We think the government's attempt to argue the possession charge in terms of May 27th is strained and unnecessary. Based on our review of the trial proceedings and defendant's acquittal for the pipe bombing on May 27th, we think it is only reasonable to conclude that the jury focused on defendant's alleged possession of an unregistered explosive on May 28th, when a pipe bomb was found in his home. Certainly the indictment brings a possession on May 28th well within its ambit, since it alleges possession "on or about" May 27th. Furthermore, we believe that the evidence, when viewed in the light most favorable to the government, supports a finding beyond a reasonable doubt that defendant knowingly possessed an unregistered explosive on May 28th, a finding not inconsistent with defendant's acquittal of actually using an explosive on May 27th.

We recently reviewed the elements of knowing possession under 26 U.S.C. § 5861(d) in *United States v. Taylor,* 728 F.2d 864 (7th Cir.1984). In that case we stated that "proof that a person actually or constructively possessed an unregistered firearm ... is sufficient proof that the person 'knowingly possessed' the unregistered firearm." *Id.,* at 868 (citations omitted). We believe the circumstantial evi-

---

**4.** The cases relied on by the government can be easily distinguished from this case. In each of the government's cases the courts could find harmless error because the government's other evidence was overwhelming. *See United States v. Reed,* 647 F.2d 678, 687 (6th Cir.), *cert. denied,* 454 U.S. 837, 1037, 102 S.Ct. 142, 580, 70 L.Ed.2d 118, 483 (1981) ("overwhelming strength of government's case"; other evidence

properly admitted "was exceptionally conclusive"); *United States v. Bosch,* 584 F.2d 1113, 1118 (1st Cir.1978) (government's other evidence was "overwhelming"); *United States v. Bowdach,* 501 F.2d 220, 228 (5th Cir.1974), *cert. denied,* 420 U.S. 948, 95 S.Ct. 1331, 43 L.Ed.2d 426 (1975) (government's other evidence "proved its case completely").

dence here was sufficient for a jury to conclude beyond a reasonable doubt that defendant had constructive possession of the pipe bomb found in his home on May 28th. We note initially that " '[c]onstructive possession exists when a person does not have actual possession but instead knowingly has the power and intention at a given time to exercise dominion and control over an object, either directly or through others.' " *Id.*, at 868 (quoting *United States v. Craven,* 478 F.2d 1329, 1333 (6th Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 54, 38 L.Ed.2d 85 (1973)). The fact that the pipe bomb was found in defendant's bedroom closet, obviously an area with limited access and over which defendant clearly exercised dominion and control, combined with defendant's presence at his residence when authorities found the explosive, strongly suggest that defendant knew it was there. *See Taylor,* at 869. In addition, Eames testified that defendant had shown Eames objects in defendant's car defendant had described as pipe bombs only two weeks before the pipe bomb was found in defendant's home. The jury could also have relied on this testimony to infer that defendant had constructive possession of the pipe bomb found in his closet. Finally, even though the jury may not have been convinced beyond a reasonable doubt that defendant caused the explosion on May 27th, they could have considered evidence linking the fragments found at the site of the explosion and the pipe bomb found in defendant's closet as other circumstantial evidence of constructive possession by defendant of the pipe bomb on May 28th. In short, we think there was ample evidence to support defendant's conviction on Count IV beyond a reasonable doubt.

## C. *Chain of Custody.*

■ Defendant's last assignment of error is that the government failed to establish a proper chain of custody for the copper pipe (government exhibit 8) and putty-like substance (government exhibit 10) purportedly found at defendant's residence and that therefore this evidence should have been excluded. Defendant contends that the chain of custody was destroyed at the outset when officer Lucas failed to place identifying tags on the items. This failure in the chain of custody is allegedly confirmed by Lucas' inability to testify on cross-examination that the exhibits were the same items found at defendant's residence, although he did say the exhibits looked identical to those items. The government points out, however, that defendant's argument overlooks the testimony of officer Hurt and special agent Van Amburgh, who were both present at defendant's residence when the search took place. Hurt and Van Amburgh stated that they recognized the exhibits as the items handed to them by Lucas and found at defendant's residence.

■ We believe, after a thorough review of the record, that the government established an adequate chain of custody for the admission of its exhibits 8 and 10 into evidence. We note that any discrepancies in the chain of custody go to the weight of the evidence, not its admissibility. *United States v. Jefferson,* 714 F.2d 689, 696 (7th Cir.1983); *United States v. Lampson,* 627 F.2d 62, 65 (7th Cir.1980). Whatever discrepancies may have existed here were resolved by the jury against defendant.

### III.

Defendant's conviction on Count I is reversed and remanded for a prompt new trial. The conviction on Count IV is affirmed.

Circuit Rule 18 shall not apply.