**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kevin L. CONNELLY, Defendant–Appellant.**

**No. 88–1966.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 29, 1988.

Decided May 1, 1989.

Lee T. Lawless, Federal Public Defender, St. Louis, Mo., for defendant-appellant.

Ralph M. Friederich, Asst. U.S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before POSNER, COFFEY, and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

The defendant-appellant Kevin Connelly and three other men were charged in a three count indictment in connection with the November 1, 1985, armed robbery of CMC Electronics, a stereo and video store in Granite City, Illinois. The indictment alleged a conspiracy to transport stolen goods in interstate commerce, in violation of 18 U.S.C. §§ 2314 and 371 (Count 1);[1] transportation of the stolen CMC merchandise in interstate commerce, in violation of 18 U.S.C. § 2314 (Count 2); and transporting and aiding and abetting the transportation in interstate commerce of a stolen CMC delivery van, in violation of 18 U.S.C. §§ 2312 and 2 (Count 3). The indictment also referred to but did not charge two other men as having participated in the CMC armed robbery. Prior to trial, two of the four charged defendants entered guilty pleas. The other two charged defendants, James Angell and the defendant-appellant Connelly, were tried jointly and Angell was acquitted on all counts. The jury acquitted Connelly on Count 3 and returned guilty verdicts on Counts 1 and 2. He was sentenced to concurrent terms of five and six years, respectively. Connelly on appeal claims that the trial judge improperly admitted evidence of his involvement in a prior, uncharged offense under Fed.R.Evid. 404(b), in order to establish Connelly's preparation, plan or identity with respect to the charged crime.

## FACTS

Michael Biederman, manager of CMC Electronics, testified that he was working with a CMC salesperson Shirley Mims the evening of November 1, 1985, when three or four black men entered the store posing as customers at approximately 8:00 p.m. Two of the men forced Biederman at gunpoint into the store's "car stereo room,"

where they bound his hands behind his back with duct tape, bound his feet with like tape, applied duct tape to his eyes and forced him to lie face down on the carpet. While lying on the floor he observed a walkie-talkie and a small revolver alongside his head.

Ms. Mims testified that before being blindfolded, two other men forced her at gunpoint into a separate room where her arms and feet were wrapped and her eyes were covered with duct tape and she was compelled to lie face down on the floor. The intruders proceeded to disengage the stereo and video display equipment from the walls and to gather and transport these items as well as other items out of the stock room into waiting vehicles parked nearby. Mims testified that during this period she heard a voice on a walkie-talkie and surmised that the robbers were conversing with someone outside the store. Approximately forty-five minutes after the arrival of the intruders they departed with CMC merchandise valued at $69,588.90 in a U–Haul truck they used to transport themselves in, together with a stolen CMC delivery van, and fled from the state of Illinois into Missouri.

Biederman testified that he was able to identify Connelly in a police lineup several days after the crime as one of the participants in the CMC armed robbery. Biederman also identified Connelly during trial as having been a participant in the CMC armed robbery. Ms. Mims, on the other hand, was unable to identify the appellant Connelly as a participant in the charged offense.

Over Connelly's objection the trial judge permitted the introduction of evidence that Connelly had previously participated in a crime similar to the offense under indictment, solely to establish preparation, plan or identity under Fed.R.Evid. 404(b).[2] Joe

---

1. Count 1 listed three overt acts committed in furtherance of the conspiracy: 1) on October 30, 1985, the appellant and others checked the location of CMC Electronics; 2) on November 1, 1985, the appellant and others committed an armed robbery of CMC Electronics; and 3) on November 1, 1985, the appellant and others stole CMC merchandise.

2. Rule 404(b) provides:
   **"(b) Other Crimes, Wrongs, or Acts.**
   Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowl-

Whitworth, the victim of the prior crime, testified that at approximately 10:00 p.m. on October 4, 1985, (less than one month before the CMC armed robbery) two black men knocked on the door of his home in Cahokia, Illinois and forced him inside the house at gunpoint, where they covered his eyes and bound his hands (behind his back) with duct tape. Whitworth then heard one of the intruders converse with someone outside the house over what sounded to him like a walkie-talkie phone. Subsequently, he heard one or more people enter the house, though he was unable to visually observe the person or persons enter. The police reports reflect that the men departed within ten minutes after the entry, taking cash, jewelry, silver coins and other items. Whitworth made three separate positive identifications of the defendant-appellant Connelly as one of the men who broke into his home on October 4—on two separate occasions before trial, one from a photo display, then at a police line-up and a third time during trial.[3]

Gary Brewer, a detective sergeant with the Cahokia, Illinois Police Department, corroborated the testimony of Whitworth and Biederman regarding their identification as well as Mims' failure to identify Connelly in a police lineup. Immediately after Brewer testified, the trial judge instructed the jury as follows:

"Ladies and gentleman, you have heard evidence from witnesses Joe Whitworth and Gary Brewer of acts of the defendant Kevin Connelly other than those charged in the indictment in this case. You may consider this evidence only on the question of preparation and plan. This evidence is to be considered by you only for this limited purpose. It is not to be considered in connection with defendant James C. Angell. Also, please bear in mind that defendant Connelly is not on trial here for the October 4 of 1985 robbery of Mr. Whitworth."[4]

The government concluded its case with testimony from two unindicted co-conspirators in the CMC armed robbery (John Boyd and Ulysses Williams) and an indicted co-conspirator (Marvin Forniss, who entered a guilty plea prior to trial), all of whom admitted their involvement in the crime referred to in the indictment and testified at trial as to Connelly's participation in the charged offense as well. In addition, Ulysses Williams testified that he, the appellant Connelly and another man (not involved in the CMC crime) committed the Cahokia home invasion on October 4, 1985, and that they used duct tape and walkie-talkies in furtherance of the crime. After Williams' testimony, the trial judge again instructed the jury that Connelly's participation in the Cahokia home invasion could "only" be con-

---

edge, identity, or absence of mistake or accident."

**3.** The federal court record reflects that on May 2, 1986, in the circuit court of St. Clair County, Illinois, the appellant Connelly entered a guilty plea to a charge of robbery in connection with the October 4, 1985, Cahokia crime, in exchange for dismissal of the State's original charge of "home invasion." On July 5, 1986, the appellant was sentenced to three years probation based on his guilty plea. Under Illinois law, "A person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force." Ill.Rev.Stat. ch. 38, ¶ 18–1. Home invasion is defined as follows:

"a) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present and

1) While armed with a dangerous weapon uses force or threatens the imminent use of force upon any person or persons within such dwelling place whether or not injury occurs, or

2) Intentionally causes any injury to any person or persons within such dwelling place."

Ill.Rev.Stat. ch. 38, ¶ 12–11. We will hereafter refer to the Cahokia crime as a "home invasion," as the appellant was originally charged with that offense.

**4.** The court on two subsequent occasions gave the jury the above instruction, except that the subsequent jury charges advised the jury that they could consider evidence of the Cahokia crime on the questions of *"identity,* preparation and plan." (emphasis added) Connelly does not complain about the discrepancy in the jury instructions, thus we will not reach this issue.

sidered as to the question of identity, preparation and plan.

In defense, the appellant, his mother and his brother testified to the effect that the appellant was at an Illinois racetrack at the time of the CMC armed robbery. The appellant stated to the jury that he neither participated in, nor planned nor conspired to commit the crime. However, Connelly did admit receiving $600 from the sale of some of the stolen CMC merchandise. He also admitted that he took part in the October 4, 1985, Cahokia home invasion, and testified that he entered a guilty plea in state court on a charge of robbery in connection with that crime, for which he received three years probation. At the close of the evidence the trial judge once again instructed and reminded the jury that Connelly was not on trial for the Cahokia home invasion.

Connelly contends that the trial judge erred in admitting evidence of his participation in the Cahokia home invasion. Fed. R.Evid. 404(b), cited *supra* n. 2, prohibits the introduction of acts extrinsic to the charged offense to establish the defendant's bad character or propensity to commit the crime under indictment. However, the government offered evidence of Connelly's prior criminal conduct under the plan, preparation or identity exceptions to Rule 404(b), and was entitled to present the evidence to the jury upon satisfaction of the four-part test outlined in *United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir. 1984):

> "Our decisions indicate that, under the dictates of Rule 404(b) and 403, admission of evidence of prior or subsequent acts will be approved if (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue (i.e., such that 'the consequential fact may be

inferred from the proffered evidence,' 2 J. Weinstein & M. Berger, *Weinstein's Evidence* § 404(8) at 404–49 (1982)), (3) the evidence is clear and convincing, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." [5]

The trial judge applied the *Shackleford* test and, in a written order entered before the trial commenced, denied the appellant's motion *in limine* seeking the exclusion of evidence of the Cahokia home invasion. On appeal, Connelly concedes that the government satisfied the first and third *Shackleford* prongs, therefore we need not discuss them. However, the appellant disputes the trial judge's findings concerning the second and fourth factors in the *Shackleford* analysis.

We will reverse a trial court's admission of evidence under Rule 404(b) "only upon a clear showing of abuse of discretion." *United States v. Brown*, 688 F.2d 1112, 1115 (7th Cir.1982). "Our role on review is not to second guess the results reached by the trial court in applying the *Shackleford* standards." *United States v. Hudson*, 843 F.2d 1062, 1065 (7th Cir.1988). Moreover, "[i]n reviewing the admissibility of relevant, potentially prejudicial evidence," this circuit "view[s] the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing the prejudicial effect." *Brown*, 688 F.2d at 1117.

■ We are confronted initially with a challenge to the application of the above standard of review to this case. The appellant argues that deference to a trial judge's decision concerning the admissibility of Rule 404(b) evidence derives from the judge's "first-hand exposure to all of the evidence and his familiarity with the course of the trial proceedings...." *Young v. Rabideau*, 821 F.2d 373, 377 (7th Cir.1987). Connelly alleges that because the trial judge denied his motion *in limine* prior to

---

5. While it is not at issue in this case, we note in passing that the Supreme Court recently lowered the *Shackleford* standard requiring "clear and convincing" proof that the defendant committed the similar act, holding that similar act

evidence should be admitted if there is "sufficient evidence" to support a finding by the jury that the defendant committed the similar act. *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988).

trial, on a "cold" record and before being exposed to and having heard all of the evidence, the "usual deference" accorded to Rule 404(b) decisions is inappropriate.

When evaluating the district judge's ruling regarding the admissibility of evidence, we are cognizant of the fact that the abuse of discretion standard applies. We are not persuaded by the appellant's argument to the contrary. The appellant is mistaken in contending that the trial court admitted the government's similar act evidence based on a "cold" record. The court's denial of Connelly's motion *in limine* was a preliminary decision, as the term *"in limine"* suggests,[6] that the evidence was admissible—a ruling subject to change based upon the court's exposure to the evidence at trial.

> "[A] ruling [*in limine*] is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling."

*Luce v. United States*, 469 U.S. 38, 41, 105 S.Ct. 460, 463, 83 L.Ed.2d 443 (1984). As a practical matter, the preliminary ruling gave the appellant an opportunity to prepare for the introduction of the evidence and allowed the government to notify and prepare its witnesses concerning the prior crime.

The judge heard the trial testimony of Michael Biederman (one of the CMC victims), Marvin Forniss (who had entered a guilty plea to the CMC armed robbery) and a Granite City, Illinois police sergeant, all of whom testified corroborating the representations made by the government in its pretrial memorandum regarding the *modus operandi* of the CMC conspirators. The government then informed the judge that its next witness, Joe Whitworth, would testify concerning the Cahokia home invasion. The judge informed counsel that his pretrial decision to admit the evidence "remains the same." Later on, Connelly's counsel objected during cross-examination of his client regarding the Cahokia crime. The judge at that time reiterated his determination that the probative value of the evidence outweighed its possible prejudicial effect. Thus, the judge's final ruling on the admissibility of the similar act evidence did result from first-hand exposure to and review of the evidence, his observation of the witnesses testifying, as well as his overall familiarity with the entire proceedings.

■ As noted above, the appellant challenges the trial court's finding that the government satisfied the second prong of the *Shackleford* analysis. *Shackleford*'s second prong requires that the other act be similar enough and close enough in time to be relevant to the matter in issue. The government's proffer of similar act evidence was prompted by Connelly's defense—made known to the government prior to trial—that he was at a racetrack when the CMC armed robbery occurred and did not plan or conspire to commit that crime. The government introduced evidence that Connelly had participated in the Cahokia home invasion on the theory that it was so similar in distinctive detail to the CMC armed robbery that it "tended to associate Kevin Connelly" with that crime as well. Similar act evidence offered on this theory—that the prior and charged offenses are so strikingly similar that the same person or persons probably had a hand in both—is frequently admitted under the identity exception to Rule 404(b), but is commonly referred to and offered as *modus operandi* evidence.[7] When evidence is

---

6. Black's Law Dictionary 708 (5th ed. 1979) defines *"in limine"* to mean "on or at the threshold; at the very beginning; preliminarily."

7. Rule 404(b) does not specifically enumerate *"modus operandi"* proof as an exception for similar act evidence but this court has approved the introduction of *modus operandi* evidence under the "identity" exception to Rule 404(b) (*see, e.g., United States v. Beasley*, 809 F.2d 1273,

1277 (7th Cir.1987); *see also* C. Wright & K. Graham, 22 *Federal Practice and Procedure* § 5246 (1978)) and at least one commentator has discussed *modus operandi* evidence under both the "identity" and "plan" exceptions (*see* J. Weinstein & M. Berger, 2 *Weinstein's Evidence* ¶ 404[15] p. 404–112 and ¶ 404[16] p. 404–127 (1988)). The government offered its similar act evidence under the identity, preparation and

offered as proof of *modus operandi*, *Shackleford*'s second prong requires that the similarities relied upon be "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof." *United States v. Shackleford*, 738 F.2d at 783, *quoting* 2 J. Weinstein & M. Berger, ¶ 404[16] at 404-130 (1988). According to Professor McCormick:

> "Much more is demanded than the mere repeated commission of crimes of the same class, such as repeated murders, robberies or rapes. The pattern and characteristics to the crimes must be so unusual and distinctive as to be like a signature. [footnotes omitted]."

*McCormick on Evidence* § 190, pp. 559–60 (3d ed. 1984).

The trial judge concluded that "There are distinctive features between the two crimes which 'support the inference that the defendant probably committed the crime' as charged in the indictment." (March 14, 1988, Order p. 4) (citation omitted). He thus found that the government satisfied *Shackleford*'s second prong. We agree with the trial judge's assessment.

The Cahokia home invasion and the CMC armed robbery were similar in a number of distinctive details. Both crimes involved walkie-talkies and both used walkie-talkies to communicate with a lookout. Duct tape was used in both crimes and it was used in a distinctive fashion: the victims' eyes were covered and their hands were intentionally bound behind their backs, but their mouths were neither taped nor were they gagged with cloth or other means to prevent the victims from calling for help. Duct tape certainly is not a necessary nor self-evidently common criminal device and, what's more, we think it is much more than coincidence that the tape was used and applied in exactly the same manner in the prior crime. Other more commonplace similarities are evident as well, and tend to

reinforce the connection between the crimes. Both crimes were committed at night; both were committed by a number of men, (one of whom, Ulysses Williams, admittedly participated in both) with at least one man acting as a lookout; and both were armed.[8]

We are convinced that the similarities between the Cahokia and CMC crimes, and particularly the use of duct tape, in a particular manner, and the use of walkie-talkies and a lookout, are sufficiently distinctive to satisfy *Shackleford*'s second prong, such that "the consequential fact [that Connelly participated in the CMC armed robbery] may be inferred from the proffered evidence." *Shackleford*, 738 F.2d at 779. We are also of the opinion that the proximity of the time of the Cahokia home invasion and the charged offense—having occurred within less than one month of each other—also militates in favor of the admissibility of the similar act evidence, as it suggests that Connelly at that time in his life was inclined to use walkie-talkies and duct tape in the commission of armed, nighttime crimes. *See United States v. Beasley*, 809 F.2d 1273, 1277 (7th Cir.1987) (regarding the relevance of time in assessing *modus operandi* evidence).

Connelly does not argue in his brief on appeal that duct tape and walkie-talkies are commonplace criminal devices but rather contends that the Cahokia home invasion and the charged offense cannot properly be considered "similar" because they were "manifestly different in scale, scope, organization, and daring...." He notes that the crime under indictment involved approximately seven men stealing $69,588.90 in merchandise while the prior, uncharged crime involved only three people stealing goods of lesser value; that the CMC conspirators engaged in elaborate planning prior to the armed robbery (for example,

---

plan exceptions, but in its brief refers to it as *modus operandi* evidence. We are in agreement that the "identity" exception is most applicable to evidence offered as proof of *modus operandi*.

**8.** In its pretrial memorandum supporting the introduction of evidence of the Cahokia home invasion, the government represented that each

of the crimes, the Cahokia home invasion and the CMC armed robbery, involved the use of multiple vehicles. On appeal, the government abandoned its reliance on the use of multiple vehicles as a factor in establishing *modus operandi*.

they timed stoplights, mapped escape routes and monitored police communications), while the Cahokia crime involved little if any planning; and that the CMC conspirators robbed a commercial establishment and required forty-five minutes to complete the crime, while the Cahokia criminal episode took only ten minutes and involved a private residence.

Appellant's argument misconstrues the *Shackleford* similarity requirement when evidence is offered as proof of *modus operandi*. The focus of the *Shackleford* analysis is not on the dissimilarities between the charged offense and the other act evidence, but on their common characteristics and whether they are of "signature quality." In this case the government demonstrated that both the CMC and Cahokia crimes involved a very similar criminal armed robbery scenario, including the use of walkie-talkies, a lookout, guns, multiple participants and duct tape to bind the victims' eyes and hands behind their respective backs. That is adequate to satisfy *Shackleford*'s similarity requirement, notwithstanding the differences between the crimes.

Connelly also complains in his brief that the government "offered nothing to prove that the use of duct tape and walkie-talkies was anything more than Ulysses Williams' *modus operandi*." Thus, Connelly continues, "in contrast to the evidence establishing that Williams employed walkie-talkies and duct tape in the robberies that he planned, the government offered nothing to establish that these features can be attributed to Connelly." Appellant's argument betrays a lack of understanding of the government's burden of proof at trial. The prosecution was not required to prove that Connelly planned the CMC and Cahokia crimes or that he was the mastermind of the *modus operandi* utilized to commit them, and Connelly has cited no authority for the proposition that *modus operandi* evidence is admissible against him only if he conceived the plan. The prosecution need only establish Connelly's participation in the charged offense, and did so through the testimony of Michael Biederman, John Boyd, Ulysses Williams and Marvin For-

niss. It also demonstrated, through Connelly's own admission, that he had entered a guilty plea in connection with the Cahokia home invasion. Finally, it proved, according to the testimony of Ulysses Williams, Michael Biederman and Shirley Mims, that both crimes involved the same *modus operandi* —the use of duct tape to restrain the victims and walkie-talkies to communicate with a lookout. In light of that proof, the jury could reasonably attribute the same plan and method at issue to Connelly.

The appellant also assigns error to Judge Stiehl's finding pursuant to *Shackleford*'s fourth prong that the probative value of the similar act evidence was not substantially outweighed by the danger that admission of the evidence would unfairly prejudice Connelly. As the trial judge noted in his written decision denying Connelly's motion *in limine*,

"[e]vidence is considered unfairly prejudicial, not merely because it damages the opposing party's case, but its admission makes it likely that the jury will be induced to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented on the crime charged. *Young v. Rabideau*, 821 F.2d 373, 377 (7th Cir.1987) (citing *United States v. Falco*, 727 F.2d 659, 666 (7th Cir.1984)). Further, '[r]elevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion under Rule 403.' *United States v. Medina*, 755 F.2d 1269, 1274 (7th Cir.1985) (quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.), *cert. denied*, 444 U.S. 862 [100 S.Ct. 128, 62 L.Ed.2d 83] (1979) (emphasis in original))."

As we noted above, the appellant placed his participation and identity in issue in maintaining that he played no role in the planning or execution of the CMC breakin. Yet the evidence demonstrated that less than one month before that crime occurred, Connelly was involved in an armed crime very similar to the charged offense in distinctive, significant detail. We hold that this evidence was highly probative of the

appellant's identity as a CMC conspirator. On the other hand, from our review of the record we refuse to conclude that the prejudicial impact of the evidence was sufficient to influence the jury to a degree that it could have decided the case on an improper basis. The trial judge gave appropriate limiting instructions on three separate occasions during the trial regarding the very limited use of the prior crime evidence. Even though several witnesses discussed the Cahokia home invasion, we are convinced that the resulting focus of the trial did not shift to the uncharged crime, thus there was no prejudicial error. Moreover, the government's proof of Connelly's identity as a member of the CMC conspiracy did not rest on the similar act evidence, but rather was secondary to direct evidence of Connelly's involvement provided by Biederman, Boyd, Williams and Forniss.

The judgment of the district court is AFFIRMED.