**Joan SOLLER, Individually and as special administrator of the estate of Brian Satermo, Plaintiff-Appellant,**

v.

**Eric MOORE and City of Milwaukee, Defendants–Appellees.**

No. 95–3205.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 20, 1996.

Decided May 24, 1996.

ly because sewer and water were not available in the town, and that he suffered lost operating income.

Ronald Bornstein (argued), Milwaukee, WI, for Plaintiff–Appellant.

Susan E. Lappen (argued), Office of the City Attorney, Milwaukee, WI, for Defendants–Appellees.

Before COFFEY, EASTERBROOK, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Many tragic lawsuits are born in the "early morning hours." And many of these suits involve drinking, driving, and poor judgment. Some even involve guns, bloodshed, and death. This is such a case.

Because a jury has spoken, we review the facts, as we must, in the light most favorable to the verdict. We start with the confluence of the paths of Eric Moore and Brian Satermo during the early morning hours of July 7, 1992.

Moore, a city of Milwaukee police officer since 1983 who was promoted to detective in 1991, finished working his shift around 2 a.m. on July 7, 1992. He was not in uniform. While driving home he encountered a red Chevy Beretta, which was driving erratically. The Beretta, it turned out, was driven by Chris Schwan with Satermo riding shotgun. Schwan and Satermo, two guys in their twenties, had spent the last five hours in a tavern on Milwaukee's northwest side.

The Beretta ran a stop sign and abruptly turned in front of Moore's car, causing him to slam on his brakes and jump the median strip. In response, Moore showed his displeasure by hitting his horn. As Moore continued to head home, he pulled alongside the driver's side of the Beretta when Schwan suddenly weaved in front of Moore again, cutting him off and forcing his car into the median. Moore now decided to pursue the Beretta, which he perceived to be a hazard on the road. An on-again, off-again chase and confrontation ensued. Some of the high-lights of the chase included: Satermo demonstrating the universal sign of disrespect toward Moore by "flipping him the bird"; the parties exchanging profanities; Moore identifying himself as a police officer; displaying his badge; and often asking, in fact ordering, the car to stop. Eventually the Beretta stopped. Moore pulled his car (actually, it was his wife's Audi) alongside the passenger side of the Beretta. The Beretta backed up, stopping at the rear of Moore's car. Moore exited his car and displayed his badge in one hand, while carrying his gun in the other. The gun was out, Moore said, because he feared for his life. He identified himself as a police officer. With Moore out of his car, the Beretta sped away. At this point, Moore testified he had told the men in the Beretta he was a police officer no less than 15 times.

Moore gave chase and caught up to the Beretta, and again it came to a stop. Moore exited his car, again with his badge in his left hand and his gun in his right. As he moved toward the Beretta, he put his badge in his pocket in order to maintain a two-handed grip on his gun. Standing on the passenger side of the Beretta with his gun drawn, he again identified himself as a police officer and ordered the two men to put their hands up, which they eventually did. He ordered Schwan to take the keys out of the ignition. Schwan refused. As he watched Schwan ignore his commands, Moore testified, Satermo suddenly pushed the muzzle of the gun out of his face, prompting Moore to yell, "Don't touch my fucking gun." Moore told the men to keep their hands up, that he was a police officer, and he repeatedly told Schwan to take the keys out of the ignition.

Satermo appeared to Moore to be very aggressive and upset; he was having difficulty controlling his anger. Moore believed that Satermo was distracting Schwan and Schwan was feeding off Satermo's aggression. Therefore, he decided to get Satermo out of the car, hoping that he could then persuade Schwan to remove the keys. Moore ordered Satermo out of the car. Initially, Satermo did not comply, but after Moore's choice of an expletive-filled command, he changed his mind. He got out and went to the rear passenger side of the Beretta. Moore told Satermo to put his hands on

the trunk of the car, which he did. Satermo stood with his legs away from the car and apart, his arms extended to the trunk. Moore kept an eye on Satermo as he pointed the gun toward Schwan, again commanding him to remove the keys. Schwan said he was not going to move, but he did not take the keys out of the ignition. Moore noticed Satermo removing his hands from the car. He pivoted his gun back at Satermo and ordered him to return his hands to the car. A slight shove in the back by Moore prompted Satermo to put his hands back on the car. According to Moore, he returned his attention to Schwan, when suddenly Satermo slammed his hands down on the trunk of the car and said, "Fuck this shit, you're going to have to shoot me." Satermo then pushed off the car and lunged toward Moore with his hands up, reaching toward Moore's upper body. Moore impulsively stepped back and shot at Satermo, striking him in the left thigh. Moore testified that when Satermo turned and lunged at him, he felt that he would be killed if his gun was taken away. After being shot, Satermo turned and ran into a nearby alley. The bullet partially severed his left femoral artery and Satermo, tragically, bled to death in the alley before police found him later that morning. Moore did not chase after Satermo; he looked back at Schwan, who quickly put his car in gear and drove away. Moore, now alone, returned to his car and drove to a nearby restaurant, where he asked patrons to call for police assistance. Schwan, who was quickly arrested, ended up pleading guilty to a charge of drunken driving; both his and Satermo's blood alcohol content were above the legal limit for intoxication.

Joan Soller, Satermo's mother, filed this suit against Moore and the City of Milwaukee under 42 U.S.C. § 1983. During the trial, which lasted two weeks, the City got out of the case on a motion. The jury ultimately found for Moore, and Soller appeals.

Soller challenges three evidentiary rulings, the failure of the district court to give a requested self-defense jury instruction, and another ruling—that Soller could not recover certain damages—we need address only if a new trial is ordered.

■ A district court's rulings on the admissibility and relevancy of evidence are reviewed under an abuse of discretion standard. *United States v. Ahangaran,* 998 F.2d 521, 524 (7th Cir.1993) (citations omitted). Evidentiary rulings focusing on the probative value of proffered evidence are also left to the sound discretion of the trial court. *Sims v. Mulcahy,* 902 F.2d 524, 531 (7th Cir.1990). "Only in an extreme case are appellate judges competent to second-guess the judgment of the person on the spot, the trial judge." *United States v. Krenzelok,* 874 F.2d 480, 482 (7th Cir.1989). Further, as we have noted, the exclusion of evidence under Rule 403 of the Federal Rules of Evidence is an important tool for trial judges to use when seeking to avoid significant litigation on issues collateral to those required to be tried. *See Sims,* 902 F.2d at 531.

Prior to trial, the court granted a motion in limine prohibiting Soller from introducing evidence that in July 1990, Moore was involved in another incident said to be strikingly similar. In that incident, Moore was in uniform, and on duty (two things, we note, that are not present in our case), when he became involved in the pursuit of a suspected traffic violator which culminated in Moore shooting the suspect in the left thigh. The court also granted motions in limine prohibiting Soller from (1) introducing as evidence certain model standards of the International Association of Chiefs of Police (IACP) relating to off-duty police officers engaging in stops of suspected traffic violators and (2) calling Assistant Chief of Milwaukee Police Alfonso Graham as a witness in the case. Finally, the court denied Soller's request that the jury be told that if it found Moore acted unreasonably in identifying himself as a police officer, Satermo had a right to resist or flee.

■ The most important ruling challenged today is the one precluding Soller from getting into the "similar" 1990 incident. Soller sought to introduce the evidence, of course, under Rule 404(b) of the Federal Rules of Evidence. The rule permits the introduction of "other crimes, wrongs, or acts" to prove such things as "motive ... intent ... or absence of mistake or accident."

The evidence Soller sought to introduce was that Moore was involved in a high speed

chase with a fellow named Rayfield Julks. After attempting to elude Moore in his vehicle, Julks stopped the car, dove out of the window, and fled on foot. Moore ran after Julks, drew his weapon, and ultimately cornered him at gunpoint. Moore contended that Julks reached into his waistband and "bolted" toward him. Moore, claiming self-defense, shot Julks in the right thigh. The proffered evidence would have also included a claim that Moore beat Julks after he was shot. Had this evidence gone in, other evidence to soften its impact—Moore was exonerated on all claims of wrongful conduct in connection with the incident—would have been presented by the defendants.

■ The basic claim in this case is that Moore used excessive force against Satermo. Claims of excessive force in the case of a "seizure" are analyzed under the "objectively reasonable" standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989); *McDonald v. Haskins*, 966 F.2d 292, 293 (7th Cir.1992). The trier of fact must look to whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation. *Id.* Our Rule 403 analysis begins by asking whether the evidence relating to the prior shooting was relevant to the issue in this case—the objective reasonableness of Moore's actions under the circumstances presented at the time Satermo was shot. Soller says that based on the similar nature of the two incidents, how could the prior act evidence not be considered relevant? The district court expressed some doubt about relevancy, finding that the reasonableness of Moore's actions with Satermo could not be shown by a previous incident in which there was a conclusion that Moore's conduct was lawful. While it is a close question, we think the evidence was relevant. But the district court's finding that it was not relevant was not unreasonable. Even assuming relevancy, it must be emphasized that Rule 403 of the Federal Rules of Evidence authorizes the district courts to exclude *relevant* evidence if its probative value is substantially outweighed by other considerations, including unfair prejudice, confusion of issues, and con-siderations based on delay. And when a district court has balanced prejudice and probativeness in making calls under Rule 403, we are especially reluctant to intervene, *Berry v. Deloney*, 28 F.3d 604, 608 (7th Cir. 1994), because the district court is in a much better position to assess these considerations than are we with only a cold record before us.

Soller could win on this issue only if we were convinced that the evidence had to be admitted, and we are not certain that it should have come in. If received, the trial could have detoured into an entire replay of the Moore–Julks encounter. A trial within a trial could have resulted. While we're certain the district judge could have structured the presentation of the issue in such a way as to cabin the evidence a bit, all sorts of irrelevancies could have conceivably crept into the case nevertheless. We are confident that the district court carefully balanced the issues here and, in the exercise of discretion, opted to take a restrictive approach. We cannot say, based on this record, that the judge abused his discretion in making the call.

■ Soller also contends that the court abused its discretion when it stopped her from offering documentary evidence from the IACP. We do not agree. She sought to introduce IACP standards and policies concerning the prohibition against off-duty officers engaging in traffic stops under circumstances where they are personally involved in the infraction. Through this evidence she sought to prove that, under the circumstances confronting Moore, he was not professionally obligated to pursue the Beretta and make the stop. Moore and the City countered that these "model" policies were not relevant to whether Moore acted within proper Milwaukee Police Department procedures and constitutional requirements with reference to his decisions and actions. The district court agreed with Moore and the City and kept the evidence out. The IACP evidence, the court thought, related to pre-seizure activity, and it was therefore not relevant to the question of whether Moore's actions in "seizing" Satermo and the force he used were objectively reasonable.

Soller concedes that the trial court was correct in determining that preseizure activi-

ty, in and of itself, does not violate the Fourth Amendment proscription against unreasonable seizures. Nonetheless, she argues that the IACP evidence did not concern itself only with preseizure activity; it went also to the question of the reasonableness of Moore's actions in "effectuating" Satermo's seizure. Soller's attempt to characterize this evidence as relating to effectuation of the seizure, rather than preseizure activity, is unpersuasive. The policies were simply not relevant to the issue of the reasonableness of Moore's actions in seizing Satermo. And furthermore, whether it is wise public policy to allow off-duty police officers to chase late-night traffic violators is beside the point; the action is not unconstitutional and, more to the point, it has nothing to do with the key issue of whether the force used after a suspect is collared is excessive under the circumstances. The district court did not abuse its discretion in barring the evidence.

■ Similarly, the district court did not abuse its discretion when it precluded the testimony of Graham, who was not a witness to the shooting or a participant in its investigation. His involvement was limited to presiding over a police department review of the shooting. Soller sought to introduce testimony from Graham regarding his response to the IACP model policies, which he read during the course of his deposition. At his deposition, Graham testified that the model policies appeared to him to represent common sense, although they were not Milwaukee Police Department policy. Soller argued that the proffered testimony would establish not only that the IACP model policies made sense, but that they were not inconsistent with city of Milwaukee police policy. In ruling on defendants' motion in limine to exclude this testimony, the district court read both the IACP model policies and Graham's deposition testimony regarding those policies. The judge concluded that the issue was what policies Moore was bound to and guided by. Since Graham did not state that the IACP model policies are Milwaukee's policy, even though he agreed that they made sense, the evidence was properly excluded.

■ Finally, Soller claims the court erred by not giving her proposed self-defense instruction with regard to Satermo's actions.

In general, appellate review of jury instructions is limited. The submission of inadequate jury instructions requires reversal only if "it appears that the jury's comprehension of the issues was so misguided that one of the parties was prejudiced." *In re CLDC Management Corp.*, 72 F.3d 1347, 1353 (7th Cir.1996) (citation omitted). When reviewing jury instructions, we construe them in their entirety to determine if "the instructions as a whole were sufficient to inform the jury correctly of the applicable law." *United States v. Villarreal*, 977 F.2d 1077, 1079 (7th Cir. 1992).

■ Soller asserts that she was proceeding on alternative theories under § 1983. One theory was that Moore shot Satermo, a nonthreatening, unarmed individual, who was attempting to flee. The other was that even if Moore shot Satermo because he was attacking him, Moore was not immunized from using deadly force under § 1983 because, in failing to act reasonably in identifying himself as a police officer, he created a physically threatening situation in the midst of a Fourth Amendment seizure. Soller argued to the district court that under her second theory of liability, the question of whether Moore or Satermo enjoyed the privilege of self-defense was the seminal issue to be decided by the jury. The district court rejected the self-defense instruction. It distinguished this case from *Celmer v. Quarberg*, 56 Wis.2d 581, 203 N.W.2d 45 (1973), a Wisconsin Supreme Court case relied upon by Soller.

*Celmer* involved an individual who was confronted by a police officer on watch at a farm suspected of cultivating marijuana. *Id.*, 56 Wis.2d at 584, 203 N.W.2d 45. The officer deliberately disguised himself to blend into the narcotics subculture, and his true identity was unknown to that individual. As Celmer attempted to get in his car and leave the farm, the officer struck him in the head with the butt of his pistol. *Id.* at 586, 203 N.W.2d 45. Celmer was able to get in his car and drive away as the officer shot out two of his tires. *Id.* Celmer sued the officer under theories of excessive force (under § 1983) and common law negligence. The trial court dismissed the § 1983 claim, finding the officer had probable cause to arrest Celmer and that he had not used excessive force. *Id.* at

587, 203 N.W.2d 45. Only the negligence claim was submitted to the jury, which found that the officer was negligent in failing to identify himself in a reasonable manner. *Id.* at 588, 203 N.W.2d 45.

The court held that,

> [w]hen a person has no reason to know the officer's status or identity as a peace officer, and the officer has made a deliberate effort to conceal his identity, the officer must make a reasonable effort to inform the person of his status as an officer. In the instant case, the plaintiff was confronted with a person who had a pistol in each hand and because of his grooming and dress appeared to be a "crazed farmer." Under the facts of this case, the plaintiff was entitled to resist and he had every right to flee from what appeared to be a serious attack upon him by another private citizen.

*Id.* at 589, 203 N.W.2d 45.

*Celmer* is easily distinguishable from this case. The evidence demonstrates that Moore, even though not wearing a police uniform, repeatedly identified himself as a police officer to both Satermo and Schwan. He did not act like the officer in *Celmer* who deliberately concealed his identity. The pivotal issue in our case is whether Moore used excessive force against Satermo. The trial court in *Celmer* found probable cause to arrest and no excessive force, dismissing *Celmer*'s § 1983 claim as a matter of law. The only remaining issue for the jury was whether the officer was negligent in failing to reasonably identify himself. In this case, giving an instruction on negligent identification and self-defense theories on the basis of this evidence might have been confusing to the jury. It was not one of the pivotal issues to be decided.

Furthermore, the jury instructions actually given as a whole correctly informed the jury of the applicable law. The jury was instructed on the law regarding § 1983 actions, Fourth Amendment protections against unreasonable seizures, and a police officer's duty, in making an arrest or seizure, to use only such force as is necessary under the circumstances. More specifically, the jury

was instructed that whether or not the force used was reasonable was to be determined in light of all the surrounding circumstances. Soller was able to argue to the jury that the surrounding circumstances included Moore's failure to clearly identify himself and, therefore, his use of deadly force against Satermo was unreasonable. This was simply an excessive force case requiring the jury to objectively review the officer's conduct in light of the surrounding circumstances. On this issue, the jury was properly instructed.

Because we have sustained the challenged rulings as discussed, we need not address the damage issue. The judgment of the district court is

AFFIRMED.