In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-3177

LEE THOMPSON, Administrator of the
Estate of James Thompson and
PAULETTE WHITE-THOMPSON,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO and OFFICER
BRADLEY HESPE,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 8883—**Amy J. St. Eve**, *Judge.*

ARGUED SEPTEMBER 21, 2005—DECIDED DECEMBER 19, 2006

Before COFFEY, EVANS, and WILLIAMS, *Circuit Judges.*

COFFEY, *Circuit Judge.* On December 5, 2000, James
Thompson died following a struggle with police officers
who were trying to handcuff him while taking him into
custody after he led them on a high-speed automobile
chase in an attempt to evade apprehension on the west
side of Chicago, Illinois. The Cook County Medical Exam-
iner later ruled Thompson's death a homicide, concluding
that he died as a result of asphyxia, resulting at least
in part from a "choke hold" applied to his neck while
officers were attempting to restrain him. Armed with this

information, Lee Thompson and Paulette White-Thompson[1] (collectively "the Thompsons"), filed suit in the United States District Court for the Northern District of Illinois against the City of Chicago ("City") and the eleven Chicago Police Department ("CPD") officers who were at the scene. In their complaint, Thompson's relatives alleged *inter alia* that the officers violated Thompson's Fourth and Fourteenth Amendment rights by using excessive force while attempting to place him under arrest, *see* 42 U.S.C. § 1983, and argued that the City and the individual officers should be held liable under the state common-law theory of wrongful death. Following discovery, the City of Chicago and the police officers submitted a motion for summary judgment, which was granted in part, dismissing the suit against four of the officers. Subsequently, six other named officers were voluntarily dismissed by the plaintiffs, leaving only Officer Bradley Hespe (the officer who allegedly placed a choke hold on the arrestee) and the City as defendants.

Prior to trial, the remaining defendants filed a number of motions *in limine*. Two of which were companion motions seeking to bar the plaintiffs from introducing: (1) the opinion testimony of officers from the CPD's Office of Professional Standards concerning their investigation into Thompson's death; and (2) the CPD's General Orders, practices and policies (or the officer's failure to act in accordance with those orders, practices and policies). The district judge granted the motions, and the trial began on July 12, 2004.

After a week long trial, and a day of deliberations, the jury found in favor of the defendants, and judgment was entered on July 21, 2004. The Thompsons filed a motion for a new trial pursuant to Rule 59 of the Federal Rules of

---

[1] Thompson's mother and wife respectively.

Civil Procedure on August 4, 2004, arguing that the district judge erred when she granted the defendants' motions *in limine, see supra* at p. 2. The motion was denied; the Thompsons appealed. We affirm.

## I. BACKGROUND

On the evening of December 5, 2000, CPD Officers Jose Cardo and Nicholas Spanos were on routine patrol on the west side of Chicago, near the intersection of St. Louis Avenue and Franklin Boulevard, when they noticed a black Ford Mustang, parked with the engine running on the eastbound side of the street. It was not apparent at that time whether there was anyone in the driver's seat. The officers proceeded westbound past the idling car, but slowed down to assess the situation, and shortly thereafter they observed an unknown male. The subject emerged from the courtyard of an adjacent apartment building, approached the Mustang, reached into the passenger side of the car, appeared to extract something, and ran back into the building. After this observation, and based on the neighborhood's reputation as a high drug trafficking area,[2] as well as the fact that the unknown male seemed to look toward the police officers as he was running back into the building, Cardo and Spanos were of the belief that they had just witnessed a narcotics buy.

The officers immediately made a u-turn, only to see the Mustang pulling away from them and heading eastbound on Franklin towards the St. Louis Avenue intersection. Without activating their emergency lights, Officers Spanos

---

[2] According to Officer Spanos, a narcotics officer with a wealth of experience in that neighborhood, he had previously made at least 25 narcotics arrests on that very block.

and Cardo followed the car for a few blocks to observe, and, after the driver ran a stop sign, a traffic stop was initiated after activating the flashing blue lights and sirens. The driver of the Mustang yielded and pulled to the side of the road; however, after both of the officers exited their vehicle and began to approach the Mustang, the car took off at a high rate of speed. The officers jumped into their squad car and gave chase and alerted their dispatcher, requesting back-up support as they continued in pursuit.

During the next few minutes the chase covered two to three miles. Officers Spanos and Cardo were joined by other CPD officers who had responded to the call for assistance. The officers involved in the pursuit tried to barricade the Mustang in (per their training), but the driver was able to evade their efforts to stop him by driving up onto lawns and over sidewalks. Considering the escalating danger to the officers, the public at large, and the suspect, the officers realized the need to seize immediate control of the situation. Shortly thereafter, they were aided by a blunder on the part of the suspect driver. While attempting to negotiate a right hand turn from Maypole Street onto Kenton Avenue in Chicago, Illinois, and traveling at a speed of approximately 40-50 miles per hour, the driver lost control and skidded over the curb and crashed into a viaduct on the northwest corner of the intersection.

One of the first officers at the crash scene, Officer Dougherty, observed the suspect's badly damaged vehicle and believing that the driver would be seriously injured, called the dispatcher and requested ambulance assistance. Joined by Officer Reyes, Officer Dougherty approached the Mustang and observed the driver having a hard time attempting to exit the severely damaged vehicle. Officer Reyes assisted in opening the driver's side door and

allowed the driver to exit. The driver, later identified as James Thompson, while attempting to gain his balance, was observed by Officer Dougherty, who, in turn, yelled at him, and instructed him to "[g]et down on the ground." Rather than obeying the officer's command, Thompson—who stood six-foot-one and weighed approximately 330 pounds—took one step forward while swinging his fist at Officer Reyes, who was unable to dodge the blow and was struck on the shoulder. Officer Dougherty, rushing the suspect and trying to seize his left arm and handcuff him, was rebuffed when Thompson, still standing, pushed him in the chest. Officer Dougherty re-engaged Thompson as Officer Reyes feverishly attempted to restrain his right hand and all three fell to the ground.

While on the ground with Thompson, Officers Reyes and Dougherty were joined in the struggle by Officers Cygnar, Rellinger, and Hespe, who had also taken part in the chase. The officers who had just arrived observed Thompson flailing his arms, while Officers Reyes and Dougherty were trying to cuff him.[3] In an effort to keep Thompson on the ground, Officer Hespe jumped on his back and placed his arm around Thompson's neck, until the other officers had completed the cuffing of his arms behind him.[4] At that point, Officer Hespe released Thomp-

---

[3] As it turns out, Thompson's wrists were too big for the traditional handcuffs, further exacerbating the already difficult task of restraining him. In the end, two pairs of handcuffs had to be interlocked in order to accommodate Thompson's massive forearms.

[4] Whether or not Officer Hespe applied pressure to Thompson's neck—or for how long if he did—was a question of fact which was tested thoroughly during cross-examination and argument before the jury. Although Officer Hespe himself did admit to placing his arm around Thompson's neck, he maintained

(continued...)

son, who continued to struggle even after he had been handcuffed.[5]

Once subdued, Thompson began complaining that he was having trouble breathing. The officers rolled him over onto his side so that they could make it easier for him to get some air, while Officer Dougherty made a second call for an ambulance. Thompson continued to complain that he was having trouble breathing, prompting Officer Cygnar to release his handcuffs.

The ambulance arrived about five minutes later, and during that period of time Thompson stopped breathing and became unresponsive. When paramedics arrived, they encountered an unconscious Thompson. Two of the paramedics testified at the trial that, when they examined Thompson at the crash scene, they believed that he had stopped breathing[6] due to a large amount of blood blocking his airway.[7] Thompson was transported via ambulance to Mt. Sinai Hospital, where he was later pronounced D.O.A. (dead on arrival).

---

[4] (...continued)
that he did not apply pressure to Thompson's neck and only attempted to stop the man from thrashing his head around.

[5] The record reveals that the entire incident, from the time when Thompson stepped from the vehicle until he was successfully cuffed, lasted not more than two minutes.

[6] It was later confirmed at autopsy that Thompson had indeed died, at least in part, due to asphyxiation.

[7] It is undisputed that, at no time, did the officers render any manner of first aid to Thompson while awaiting the ambulance's arrival.

A.  Thompson's Family Files Suit

Following Thompson's death, an autopsy was conducted. In a report issued on April 12, 2001, from the medical examiner who conducted the autopsy, a Dr. Lifschultz, concluded that "James Thompson died as a result of asphyxia due to a choke hold," but also determined that Thompson was suffering from "[h]ypertensive cardio-vascular disease and opiate intoxication," which in turn were found to be contributory causes of his death.

On November 16, 2001, Thompson's wife, Paulette White-Thompson, and his mother, Lee Thompson,[8] filed suit against the City and eleven officers in the Federal District Court for the Northern District of Illinois. The original complaint was followed by two amended complaints[9] seeking damages arising from Thompson's death under both state and federal law. The second amended complaint alleged that the City and the officers, in both their individual and official capacities, had violated Thompson's Fourth and Fourteenth Amendment rights under the United States Constitution when denying him equal protection and due process with the use of excessive force while taking him into custody. *See* 42 U.S.C. § 1983. In addition, the complaint averred common law causes of

---

[8] Thompson's mother sued as the administrator of her son's estate. She and Thompson's wife also brought individual claims.

[9] In the original complaint, ten of the officers had not been identified by name and were sued as Doe defendants. Only Detective Raymond Kaminski, who had personal contact with Thompson's wife, was named in the complaint. The first amended complaint was filed on April 15, 2002, listing the previously unnamed police officers; Officers Bradley Hespe, Eric Reyes, Brendan Dougherty, Shawn Rellinger, Brian Cygnar, Michael Kozenko, Anthony Bauman, Mark Golosinski, Jose Cardo, Nicholas Spanos and Detective John Fitzsimmons.

action for wrongful death and civil conspiracy under Illinois state law. Following discovery, the defendants moved for summary judgment on all claims.

The trial judge granted the summary judgment motion in part and dismissed the plaintiffs' equal protection claims under § 1983 as well as the state common law and civil conspiracy claims as to all of the defendants.[10] *Thompson v. City of Chicago*, No. 01-C-8883, at *10-17 (N.D. Ill. May 27, 2004). Further, the plaintiffs' wrongful death claims were dismissed as to all of the officers named except for Officer Hespe, who had allegedly applied the fatal choke hold. *Id.* at *12-13. The plaintiffs later voluntarily dismissed the other ten on-scene officers from the suit, leaving only the City[11] and Officer Hespe as defendants.

Prior to trial, the remaining defendants filed a number motions *in limine*. One motion sought to exclude any

---

[10] The district court also granted summary judgment to Thompson's wife and mother on their individual due process and equal protection claims brought under the Fourth Amendment. *See supra* n.6, and accompanying text. The court found that the individual claims should be dismissed on the merits and did not reach the defendants' lack of standing argument. However, as discussed *infra*, the trial judge could have properly dismissed the individual § 1983 claims on precisely that ground. *See infra* n.25.

[11] While it is well-established that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory," *Monell v. New York City Dep't of Soc. Services*, 436 U.S. 658, 691 (1978), this is not true for a wrongful death suit under Illinois law, *see Larson v. State*, 50 Ill. Ct. Cl. 1, 5-6 (1997). Thus, because Officer Hespe was sued in both his individual and official capacities, and because the state law wrongful death claim against him survived summary judgment, the City likewise remained in the case as a defendant.

reference in testimony, evidence or argument to the CPD's General Orders, policies and procedures.[12] The other sought to bar expert testimony that the plaintiffs intended to introduce through a CPD Office of Professional Standards inspector and a CPD sergeant who investigated the allegations of excessive force during Thompson's arrest. The plaintiffs intended to ask these experts whether Officer Hespe: (a) used excessive force; or (b) violated any CPD General Orders, policies or procedures when arresting Thompson. The City and Officer Hespe argued that the probative value of such evidence was substantially outweighed by the danger of unfair prejudice and that it would not aid the jury in reaching a decision but would cause confusion. The district court agreed and granted the *motions in limine* under Rules 401 and 403 of the Federal Rules of Evidence.

B.  The Trial

The trial commenced on July 12, 2004, with both sides introducing evidence from CPD officers as well as various medical experts. The plaintiffs began by examining Dr. Lifschultz, a forensic pathologist and a Cook County, Illinois, medical examiner, who ruled that Thompson died by asphyxiation caused, at least in part, by a choke hold. Dr. Lifschultz testified that his examination of Thompson revealed a number of external and internal injuries,

---

[12] Although the trial judge granted the motion, the docket entry for the order did not include the phrase "exclude any reference." Instead it merely said: "Defendant's motion in limine to exclude evidence of Chicago Police Department General Orders, policies and procedures . . . is granted."

including self-inflicted bite marks on the tongue,[13] hemorrhaging in the soft tissue covering the vocal box[14] and thyroid glands, and hemorrhaging into Thompson's sclerae.[15] According to Dr. Lifschultz, all of these injuries were consistent with death by asphyxia due to a choke hold. He admitted, however, that he did not reach that conclusion based on medical evidence alone, but also reviewed the police reports concerning the incident. Dr. Lifschultz further discussed other factors which may have contributed to Thompson's death, such as the fact that he was suffering from hypertensive cardiovascular disease with a markedly enlarged heart and that he was under the influence of opiates prior to and during the time he was struggling with the police.

The plaintiffs called another forensic pathologist, Dr. Kris Sperry, Chief Medical Examiner for the State of Georgia, to testify regarding the cause of Thompson's death. Dr. Sperry agreed with Dr. Lifschultz that the pressure applied to Thompson's neck initiated a fatal heart arrhythmia, which is what actually lead to his death. Dr. Sperry acknowledged, however, that Thompson's pre-existing heart disease[16] and the presence of morphine in his blood also contributed to the fatal arrhythmia. He also admitted that the car chase, the subsequent crash, and the struggle with police could have

---

[13] Dr. Kris Sperry, Chief Medical Examiner for the State of Georgia, and an expert medical witness for the plaintiffs, testified that the bite marks were the result of the "direct trauma" of the car crash and deployment of the air bags.

[14] Caused by pressure being applied to the neck.

[15] Commonly known as the whites of the eyes.

[16] Dr. Sperry estimated that Thompson's heart was enlarged "between two and three times normal size."

increased Thompson's adrenaline level, heart rate, and blood pressure.[17] Dr. Sperry conceded that the autopsy report revealed no neck injuries to Thompson and noted that, while prolonged neck compression causes a person to pass out and quit breathing within seconds, Thompson was conscious and still struggling after Officer Hespe released him.

Next on the stand for the plaintiffs was Sergeant Jackie Campbell, an instructor at the Chicago Police Academy at the time of Thompson's death, who provided expert testimony concerning the circumstances under which the CPD guidelines authorize the use of force against a suspect. The sergeant testified that the CPD had a control tactics program in place which was intended to familiarize officers with when the use of force would be constitutionally and statutorily authorized. Sgt. Campbell described three levels of assailants that officers are trained and taught to identify at the Chicago Police Academy: (a) low-level; (b) mid-level; and (c) high-level. Sgt. Campbell stated that the authorized use of force for each level ranges from no force, or just verbal commands, for low-level assailants, to the use of impact weapons[18] for high-level assailants.[19] Sgt. Campbell went on to testi-

---

[17] Dr. Sperry's testimony was corroborated by the testimony of defense expert, Dr. Peter Santucci, a cardiac electrophysiologist on the staff of Loyola University Medical Center in Chicago. Dr. Santucci stated that, as the stress of the night's events increased, it is likely that Thompson's blood pressure rose and extra beats of his heart started to increase, leading to the fatal arrhythmia.

[18] So-called "impact weapons" could be anything from pepper spray and punching to the use of a baton.

[19] However, Sgt. Campbell also stated that the lethal force was only to be used on high-level, high-risk assailants, *i.e.*, those

(continued...)

fy that a choke hold would constitute deadly force and would be unwarranted against a suspect resisting arrest in the manner of Thompson, who would be considered a mid- or low-level assailant.[20] In addition, Sgt. Campbell made clear that Chicago police officers are not trained to use choke holds and that the use of a choke hold would be contrary to the officers' training and departmental procedures.[21]

Finally, the plaintiffs called Dr. Geoffrey Alpert, Ph.D., professor of criminology at the University of South Carolina.[22] According to Alpert, while the officers were undeniably entitled to use physical force against Thompson[23] based on his level of resistance, they were not authorized to use lethal force under Chicago police proce-

---

[19] (...continued)
that posed a threat of serious bodily injury or death to officers and the public.

[20] She added that the use of deadly force on a hypothetical low- or mid-level assailant would, in her opinion, be "excessive."

[21] When asked whether officers would be allowed to use a choke hold against a person resisting arrest, Sgt. Campbell stated: "We don't train to use choke holds." She also testified that the use of choke holds have not been taught since 1983.

[22] The plaintiffs also called a number of other witnesses, including the two paramedics who arrived on the scene to find Thompson dead. Thompson's mother, wife, and other relatives appeared as damages witnesses. Their testimony is largely summarized in the preceding section of this opinion or is irrelevant to the issues on appeal.

[23] Dr. Alpert highlighted the fact that Thompson was an extraordinarily large man and that he was using physical force against the officers in an attempt to resist arrest.

dures in place at the time.[24] Alpert added that instead of administering a choke hold which constitutes deadly force, the officers could have tackled him, incapacitated him with pepper spray, or even used a baton on him below the waist.

The defense countered with the testimony of two experts of their own. Dr. Peter Santucci, a cardiac electro-

---

[24] While Alpert was being questioned about whether officers would be justified in putting a choke hold on Thompson, the following colloquy took place:

Q: Now, did you also come to an opinion as to whether Officer Hespe's actions exhibited a conscious disregard for Mr. Thompson's welfare?

A: Yes, sir.

Q: What's your opinion in that regard?

A: Well it did because the use of that type of hold, that type of choking mechanism, is deadly force and unjustified; and, therefore, it is likely to cause an injury or death, and there's just no room for it in this situation.

Q: Now, based on your review of the Chicago Police Department documents in this case, are Chicago police officers trained in the risks of choke holds?

A: In the sense that—they're not trained to do choke holds. As I said earlier, since 1983, I believe it was, they have not been trained in using a choke hold; and, therefore, it's against policy.

* * *

Q: Now, although officers are not trained in the use of a choke hold here in Chicago, are there circumstances that they might use it?

A: Yes, sir.

Q: When?

A: When their life is in jeopardy.

physiologist and assistant professor at the Loyola University Medical Center in Chicago, Illinois, testified that Thompson's heart was irregular as a result of severe cardiomyopathy, hypertension, obesity, and a markedly enlarged heart. According to Dr. Santucci, it was these conditions, coupled with increased adrenaline levels due to stress (e.g., the car chase, wreck and struggle with police), which led to a sustained arrhythmia, cardiac arrest and death, not the choke hold. Similarly, Dr. Charles Wetli, Chief Medical Examiner and Director of Forensic Sciences for Suffolk County, New York, concluded that Thompson died from cardiac arrhythmia precipitated by his severely compromised heart and the physical exertion associated with his altercation with the police.

In addition to the medical experts, the defense called a number of officers who testified about their experiences the evening of Thompson's death. Each of the officers recounted the details of the chase and the resulting confrontation with Thompson, as well as their trying as hard as they could so they might restrain him while they attempted to handcuff him. Except for Officer Hespe, who candidly admitted placing his arm over Thompson's neck in an effort to keep him from thrashing around, none of the officers recalled Officer Hespe putting Thompson in a choke hold. But, while Officer Hespe admitted placing his arm around Thompson's neck, he specifically denied placing any pressure on his neck.

On July 21, 2004, the jury returned their verdict, finding for the defendants on all counts. The plaintiffs moved for a new trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure, which was denied. The plaintiffs appealed.

## II. ISSUES

On appeal, the plaintiffs-appellants challenge only the district court's pre-trial rulings on the two motions *in limine*. The Thompsons insist that the trial court erred when it barred them from presenting evidence concerning the CPD's General Orders pertaining to the appropriate use of force. They also maintain that it was reversible error for the trial judge to preclude them from eliciting expert testimony from Inspector James Lukas and Sgt. Jackie Campbell of the CPD concerning whether or not Officer Hespe used excessive force when he was attempting to subdue and control Thompson. The Thompsons urge this court to remand for a new trial.[25]

---

[25] In addition to remanding for a new trial, the Thompsons ask us to order the district court to reinstate their individual 42 U.S.C. § 1983 claims that were dismissed at the summary judgment stage. Specifically, they argue that they have standing to bring such a claim based on their familial relationship to James Thompson. While we need not reach this issue, because we find remand unnecessary, *see infra*, it is worth noting that their § 1983 claim was properly dismissed. The Thompsons predicate their argument in this respect on this court's decision in *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984), which implicitly recognized a plaintiff's right to recover on the basis of an alleged violation of the constitutional rights of an immediate family member. *See Bell*, 746 F.2d at 1243-47. However, *Bell* has been expressly overruled by *Russ v. Watts*, 414 F.3d 783, 787-91 (7th Cir. 2005). In *Russ*, we reexamined the holding in *Bell* and concluded that "finding a constitutional violation based on official actions that were not directed at the parent-child relationship would stretch the concept of due process far beyond the guiding principles set forth by the Supreme Court." *Id*. at 790. Accordingly, as in *Russ*, Thompson's mother and wife do not have standing to pursue a § 1983 action against the City of Chicago or Officer Hespe, as they have not even alleged that
(continued...)

## III. ANALYSIS

When reviewing a district judge's evidentiary rulings, we apply the abuse of discretion standard. *See United States v. Hale*, 448 F.3d 971, 985 (7th Cir. 2006). Under this standard, "[w]e give special deference to the district court's assessment of the balance between probative value and prejudice because that court is in the best position to make such assessments." *See id.* (citing *United States v. Turner*, 400 F.3d 491, 499 (7th Cir. 2005)); *see also United States v. Denberg*, 212 F.3d 987, 992 (7th Cir. 2000) ("The district court's determination of the admissibility of evidence is treated with great deference because of the trial judge's firsthand exposure to the witnesses and the evidence as a whole, and because of [her] familiarity with the case and ability to gauge the likely impact of the evidence in the context of the entire proceeding."). Taking into consideration this special degree of deference given to the district court's evidentiary rulings, "we will not reverse unless 'the record contains no evidence on which [the trial judge] rationally could have based [her] decision.'" *Okai v. Verfuth*, 275 F.3d 606, 610 (7th Cir. 2001) (quoting *United States v. Walton*, 217 F.3d 443, 449 (7th Cir. 2000)).

### A. Admissibility of the CPD's General Orders Regarding Use of Force

As stated heretofore, the defendants-appellees filed a pretrial motion *in limine* asking the trial court to exclude the CPD's General Orders concerning the appro-

---

[25] (...continued)

Thompson was killed "for the specific purpose of terminating [Thompson's] relationship with his family." *Id.*

priate use of force. The district court granted the defendants' motion *in limine* pursuant to Federal Rules of Evidence 401 and 403, concluding that "such evidence [was] not relevant and that the probative value of such evidence [was] substantially outweighed by the danger of unfair prejudice and jury confusion*." See Order Granting Defendant's Motion in Limine to Exclude Evidence, Thompson v. City of Chicago*, No. 01-C-8883 (N.D. Ill. July 7, 2004); Fed. R. Evid. 401, 403. On appeal, the Thompsons argue that the CPD's General Orders were relevant under Federal Rule of Evidence 401, because the Orders would have given the jury an objective criteria with which to judge the officer's action and that the introduction of such evidence actually would have allayed rather than perpetuated jury confusion under Rule 403. We disagree.

### 1. Federal Rule of Evidence 401

Evidence is relevant when it has "any tendency to make the existence of any fact that is *of consequence to the determination of the action* more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphasis added). "To be relevant, evidence need not conclusively decide the ultimate issue in a case, nor make the proposition appear more probable, 'but it must in some degree advance the inquiry.'" *E.E.O.C. v. Indiana Bell Telephone Co.*, 256 F.3d 516, 533 (7th Cir. 2001) (Flaum, C.J., concurring in part & dissenting in part) (quoting 1 J. Weinstein & M. Berger, *Weinstein's Federal Evidence* § 401.04 [2][b]).

In this case, the text of the CPD's General Orders pertaining to the use of force would not have been of any consequence whatsoever and would have failed to advance the inquiry into whether Officer Hespe violated Thompson's Fourth Amendment rights by using excessive

force in apprehending him. In order to establish an excessive force claim under § 1983, plaintiffs must demonstrate that a state actor's use of force was "objectively unreasonable" under the circumstances. *See DeLuna v. City of Rockford, Ill.*, 447 F.3d 1008, 1010 (7th Cir. 2006) (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). What constitutes "reasonableness" with regard to an officer's actions in apprehending a suspect under the Fourth Amendment is "'not capable of precise definition or mechanical application' but 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005) (quoting *Graham*, 490 U.S. at 396). The reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386, 396 (1989). This calculus of reasonableness must allow for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation. *Id.* at 387.

The fact that excessive force is "not capable of precise definition" necessarily means that, while the CPD's General Order may give police administration a framework whereby commanders may evaluate officer conduct and job performance, it sheds no light on what may or may not be considered "objectively reasonable" under the Fourth Amendment given the infinite set of disparate circumstances which officers might encounter. Indeed, the CPD's General Orders state that they are intended merely to "provide members guidance on the reasonableness of a

particular response option," when taking a suspect into custody.[26] *See* CPD General Order 02-08(III)(D).

What's more, this court has consistently held that "42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices." *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003); *see Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 526 (7th Cir. 2001); *Soller v. Moore*, 84 F.3d 964, 969 (7th Cir. 1996). In other words, the violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established. *See id.* In *Scott*, the plaintiff in a Fourth Amendment excessive force action sought to defeat summary judgment based on affidavit testimony demonstrating that a police officer who shot into a moving vehicle breached a municipality's police procedures and thus violated the Fourth Amendment's excessive force prohibition. The district court granted summary judgment and we affirmed, holding that "whether [the officer's] conduct was either good police practice or a violation of Illinois law" was immaterial to whether he violated the Fourth Amendment. *Id.* at 760, 761.

In *Whren v. United States*, the Supreme Court addressed the use of police manuals and standard procedures to

---

[26] CPD General Order 02-08(III)(C) acknowledges the Supreme Court's seminal decision in *Graham v. Connor*, 490 U.S. 386 (1989) and states that: "Reasonableness is not capable of precise definition or mechanical application. Circumstances that may govern the reasonableness of using a particular force option include, but are not limited to: a. the severity of the crime at issue, b. whether the subject poses an immediate threat to the safety of the officer or others, [and] c. whether the subject is actively resisting arrest or attempting to evade arrest by flight."

evaluate what a "reasonable officer" would do under the Fourth Amendment in the context of a traffic stop. 517 U.S. 806, 815-16 (1996). The Court concluded that because police rules, practices and regulations vary from place to place and from time to time, they are an unreliable gauge by which to measure the objectivity and/or reasonableness of police conduct. *Id*. at 815. Although *Whren* involved the constitutionality of searches rather than excessive force, both inquiries—whether a search is constitutional and whether the officer has used excessive force—involve an evaluation of the "reasonableness" standard of an officer's conduct under a particular set of facts and circumstances. *See id*.; *Tanberg v. Sholtis*, 401 F.3d 1151, 1163 (10th Cir. 2005). Accordingly, we are confident that, if confronted with the question of whether police manuals, guidelines or general orders are "reliable gauges" of the reasonableness of an officer's use of force, the Court would reach the same conclusion that it did in *Whren*.

Whether Officer Hespe's conduct conformed with the internal CPD General Orders concerning the use of force on an assailant was irrelevant to the jury's determination of whether his actions on December 5, 2000 were "objectively reasonable" under the Fourth Amendment. It may be that Officer Hespe's possible violation of the CPD's General Orders is of interest to his superiors when they are making discipline, promotion or salary decisions, but that information was immaterial in the proceedings before the district court and was properly excluded. Instead, the jury in all probability properly assessed the reasonableness of Officer Hespe's split-second judgment on how much force to use by considering testimony describing a rapidly evolving scenario in which Thompson attempted to evade arrest by leading the police on a high speed chase, crashed his car, and actively resisted arrest.

2. Harmless Error

Even if we were to assume *arguendo* that evidence concerning the CPD's General Orders, policies and procedures were improperly excluded, any such error was harmless. *See, e.g.*, *Barber v. Ruth*, 7 F.3d 636, 641 (7th Cir. 1993). As this court has consistently held, "[n]o error in either the admission or exclusion of evidence is ground[s] for . . . vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice." *Goodman v. Illinois Dept. of Financial and Professional Reg.*, 430 F.3d 432, 439 (7th Cir. 2005) (quoting *Speedy v. Rexnord Corp.,* 243 F.3d 397, 404 (7th Cir. 2001)). In other words, "[e]ven an erroneous evidentiary ruling can be deemed harmless if the record indicates that the same judgment would have been rendered regardless of the error." *Id*. Such is certainly the case here.

While direct reference to the CPD's General Orders was avoided at trial, references and testimony concerning the CPD policies and procedures were ubiquitous during the proceedings. For example, Sgt. Campbell testified at length concerning the CPD's use of force guidelines and answered a number of questions regarding what use of force would have been authorized in a situation like the one the officers encountered with Thompson. *See supra*, pp. 11-12. Regarding the application of choke holds, Sgt. Campbell specifically stated that such a procedure was not authorized by the CPD and that officers had not been trained in such a technique since 1983. *See id*. at p. 12 n.21. In addition, Sgt. Campbell stated that a choke hold constituted deadly or lethal force and that such force would not have been authorized for an assailant behaving in a manner similar to that of Thompson. *See id.*

Another witness, Dr. Alpert, also testified regarding CPD regulations and procedures and corroborated Sgt.

Campbell's testimony. Specifically, Alpert testified that the officers who arrested Thompson would not have been entitled to use lethal force when attempting to subdue him pursuant to CPD procedures in place at the time. Further, Alpert gave his response to a number of questions regarding the propriety of choke holds. Like Sgt. Campbell, he stated that since the mid-1980s, the CPD had not authorized the technique and that officers were not allowed to use the procedure under any circumstances. He added that, if such a procedure were used, it would constitute deadly force, which as he stated earlier in his testimony would not have been applicable to Thompson under the circumstances because his resistence did not place the public or the officers in peril of serious bodily injury or death at the time he was being handcuffed. Alpert added that, in lieu of deadly force, *i.e.*, a choke hold, the officers could have employed a number of techniques in attempting to quell Thompson's resistance, such as employing pepper spray (one or a number of sprays to the facial area) to blind, confuse, and subdue him temporarily. *See id.*

Given that evidence of the CPD's policies, values, and procedures was introduced at length at trial on direct and cross-examination, it would have been of very little help to the Thompsons' cause to introduce the actual text and provision numbers of the CPD's General Orders. As such, even if such evidence were relevant, which we have concluded it was not, any error in failing to allow such evidence to be admitted was harmless because "the same judgment would have been rendered regardless of the error." *Goodman*, 430 F.3d at 439.

### 3. Federal Rule of Evidence 403

As discussed above, the law is clear that introduction of evidence of the CPD's General Orders was immaterial to

the Thompsons' § 1983 claims. Nonetheless, the Thompsons argue that this evidence would have been relevant to their wrongful death claims under state law. While we assume, without deciding, that the CPD's General Orders were relevant to the Thompsons' wrongful death claim, we conclude that they were properly excluded under Rule 403.

Rule 403 provides a district court with discretion to exclude evidence where "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." This court has explained that " '[e]vidence is considered unfairly prejudicial, not merely because it damages the opposing party's case, but also because its admission makes it likely that the jury will be induced to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented . . . .'" *United States v. Connelly*, 874 F.2d 412, 418 (7th Cir. 1989) (quoting *Young v. Rabideau*, 821 F.2d 373, 377 (7th Cir. 1987)).

Under the Illinois Wrongful Death Act, 740 ILCS 180/1, a plaintiff must establish that the: "(1) defendant owed a duty to decedent; (2) defendant breached that duty; (3) the breach of duty proximately caused decedent's death; and pecuniary damages arising therefrom to persons designated under the Act." *Leavitt v. Farwell Tower Ltd. P'ship*, 625 N.E.2d 48, 52 (Ill. App. Ct. 1993). Thus, under the Act, the breach of duty is an important determination. A problem with allowing the CPD's General Orders into evidence is that those orders do not create a duty to the public at large. *See Morton v. City of Chicago*, 676 N.E.2d 985, 992 (Ill. App. Ct. 1997) (stating the oft-reiterated proposition under Illinois law that "the violation of self-imposed rules or internal guidelines, such as General Order 81-8, does not normally impose a legal duty, let alone constitute evidence of negligence, or beyond

that, wilful and wanton conduct"); *Blankenship v. Peoria Park District*, 647 N.E.2d 287, 291 (Ill. App. Ct. 1995) (stating: "While the violation of a *statute* or *ordinance* designed to protect human life or property is *prima facie* evidence of negligence, a legal duty is normally not established through rules or internal guidelines, and the failure to comply with self-imposed regulations does not necessarily impose upon municipal bodies and their employees a legal duty") (internal citations and quotations omitted) (italics in original). As mentioned above, the General Orders regarding use of force are intended only "in order to provide members guidance on the reasonableness of a particular response" to the actions of an assailant. *See* CPD General Order 02-08(III)(D).

While it may be that failure to adhere to the General Orders may cause an officer problems with his superiors in the CPD, or possibly even lead to disciplinary proceedings against him or her, they have little or no bearing on whether the officer breached his duty of care in apprehending Thompson. Any limiting instruction explaining to the jury that, although the General Orders do not create a duty on the part of an officer and can only be used as evidence of a breach of protocol in a disciplinary proceeding—and that they could not be considered in conjunction with the plaintiffs' § 1983 claims—would have led to unnecessary and detrimental jury confusion. *See, e.g.*, *Tanberg*, 401 F.3d at 1164-65. In short, evidence about the specifics of the CPD's General Orders might very well have contributed to unfair prejudice and would have caused confusion regarding the plaintiffs' wrongful death claims. Accordingly, the district court did not abuse its discretion in excluding such evidence.

*B. Admissibility of Expert Testimony Concerning Excessive Force*

The Thompsons also challenge the district court's exclusion of expert testimony from Inspector James Lukas of the CPD's Office of Professional Standards and Sgt. Jackie Campbell, regarding whether Officer Hespe violated the Fourth Amendment by using excessive force when apprehending Thompson. The trial judge granted the defense motion *in limine* pursuant to Federal Rule of Evidence 403, stating that the "probative value of such evidence [was] substantially outweighed by the danger of unfair prejudice" and that evidence of that nature would pose the "danger of unfair prejudice and jury confusion." *Order Granting Defendants' Motion in Limine to Exclude Evidence, Thompson v. City of Chicago*, No. 01-C-8883 (N.D. Ill. July 7, 2004). We agree.

As referred to above, the question of whether a police officer has used excessive force in arresting a suspect is a fact-intensive inquiry turning on the reasonableness of the particular officer's actions in light of the particular facts and circumstances of the situation faced. *See, e.g.*, *DeLuna*, 447 F.3d at 1010. What is reasonable under any particular set of facts is "not capable of precise definition or mechanical application." *Abdullahi*, 423 F.3d at 768. Accordingly, whatever insight Inspector Lukas and Sgt. Campbell might have had into whether or why Officer Hespe used excessive force would have been of little value except as to possibly causing confusion and bore a substantial risk of prejudice. The jury, after having heard all of the evidence presented, was in as good a position as the experts to judge whether the force used by the officers to subdue Thompson was objectively reasonable given the circumstances in this case. Introducing two experts to testify that Officer Hespe used excessive force would have induced the jurors to substitute their own independent conclusions for that of the experts. In other words, they

would have been "induced to decide the case on an improper basis . . . rather than on the evidence presented . . . ," which is precisely why the evidence should have been excluded.[27] *Connelly*, 874 F.2d at 418.

## IV. CONCLUSION

We conclude that the district judge did not abuse her discretion in granting the defendants-appellees' motions *in limine*, thus we need not determine whether a new trial is warranted. The decision of the district court is

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

---

[27] Additionally, testimony by Inspector Lukas and Sgt. Campbell regarding whether Officer Hespe used excessive force would have likely involved a discussion of the CPD's General Orders, which as we have decided are not relevant. *See supra*, Part III.A.