Filed 6/23/16  P. v. Howard CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. MICHAEL BRIAN HOWARD, Defendant and Appellant. | D068181 (Super. Ct. No. SCE344829) |


APPEAL from a judgment of the Superior Court of San Diego County, Evan P. Kirvin, Judge.  Affirmed.

Laurel M. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Kristen Hernandez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Michael Brian Howard of one count of resisting an executive officer by force or violence. (Pen. Code,[1] § 69.) The court sentenced him to a total term of five years in state prison. On appeal, Howard contends the trial court erred by granting the People's pretrial motion to exclude the testimony of his defense expert witness on the issue of reasonable force and police department standards and procedures on the use of force, which he maintains denied him his constitutional right to present a complete defense.

Recently, in *People v. Brown* (2016) 245 Cal.App.4th 140, Division Four of the Court of Appeal, First Appellate District, addressed whether expert testimony is admissible on a criminal defendant's defense to a section 69 charge that his arrest or detention was unlawful due to an officer's use of excessive force. As we explain, we agree with *Brown*'s rationale and apply it in this case, which compels us to hold that Howard's proffered expert testimony was inadmissible and specialized knowledge was not required here, where the law enforcement officers used only bodily force and bare hands in restraining Howard. Under these circumstances, the jury was competent to apply its own common sense in determining the objective reasonableness of the officers' actions, and the expert's conclusions as to the lawfulness of their actions would have usurped its role. Because the trial court did not err by excluding Howard's defense expert's testimony, we affirm the judgment.

---

1    Undesignated statutory references are to the Penal Code.

FACTUAL AND PROCEDURAL BACKGROUND

On October 15, 2014, San Diego County Sheriff Deputies Douglas Roysdon and David Sanchez, accompanied by explorer[2] Andrew Ferrante, patrolled transient encampments near a river bottom to conduct field interviews and write citations for illegal lodging. Deputy Roysdon and Ferrante approached a tent and asked another person to have Howard come out. After Howard did so, Deputy Roysdon engaged him in a conversation, asking if he had contraband or anything illegal on him. Howard said no, and the deputy asked Howard if he would consent to a search, to which Howard agreed. During the search, the deputy found a syringe in Howard's front shorts pocket. When asked about the syringe, Howard pulled away from Deputy Roysdon and took off running through the encampment. Deputy Roysdon pursued on foot. Howard tripped and fell face down onto his stomach. When Howard started to get back up, the deputy "jumped on top [of Howard] to make sure he wouldn't get away."[3]

Deputy Roysdon described the skirmish: "I came up behind him on his back, started putting downward pressure on his back with my chest, and put my arms kind of around him . . . [t]o essentially detain him right there." As the deputy "bear hugg[ed]" Howard, telling him to "Stop. Stop," Howard began "throwing his elbows back" at the deputy. Deputy Roysdon stated Howard threw "at least six" elbows at him while

---

[2]    An "explorer" volunteers with the San Diego County Sheriff's Department in a program for individuals under the age of 21 who have an interest in a law enforcement career.

[3]    Deputy Roysdon stood five feet, eleven inches tall and weighed about 230 pounds with his gear on; Howard stood six feet, one inch tall and weighed about 185 pounds.

3

Ferrante estimated "10 to 20."  After struggling for about 30 seconds, Deputy Roysdon took Howard to the ground and yelled for Ferrante to get help.

Ferrante explained:  "I ran up on them, I placed my left knee on the male's legs so he could stop kicking them, I then placed my left hand on the lower right side of his back, and I tried to take control of his right arm."[4]  Once Ferrante pinned down Howard's right arm, Deputy Roysdon pulled out Howard's left arm from underneath his body to handcuff him while Howard struggled.  About a minute later, Deputy Sanchez arrived.

Deputy Sanchez stated:  "I went to the location where they were struggling and I placed my right knee on the top of the defendant's shoulders in about this area, base of the neck top of the shoulders area, and told him to quit resisting and to . . . free his hands up for [Deputy] Roysdon."  After 30 to 45 seconds, Howard stopped resisting and the deputies handcuffed him.  Howard sustained a cut on the left side of his face from the encounter.

In his trial brief, Howard reserved the right to call as a defense expert Jack Smith on police procedures and use of force.  Smith submitted a report stating he was a former municipal police officer and sheriff for 35 years, and had been qualified as an expert on police policy, procedures and tactics in federal and state courts.  He stated he had made recommendations to civilian commissions and boards pertaining to officer-involved shootings and other uses of force regarding policy and procedure, training, tactics, discipline and lawsuit defense.  Smith stated he had reviewed documents including the

---

[4]     Ferrante was 5 feet, 11 inches tall and weighed 155 pounds at the time.

complaint and Howard's arrest report, and concluded that Howard and Deputy Roysdon were involved in a consensual encounter, and while the force seemed objectively reasonable under the circumstances, it was not "legally applied." He stated: "It appears that Mr. Howard was escaping a consensual encounter, which he has the right to do. He was not told that he was being detained or that he was under arrest. Accordingly, any force used was not applied during the deputies' lawful course and scope of their duties." He concluded: "It is my opinion that Mr. Howard was not detained or arrested in a manner consistent with the deputy's training before he attempted to escape from a consensual encounter."

The People moved to exclude Smith's testimony from trial on grounds it was irrelevant, overly prejudicial, misstated the law and would unduly consume the court's time. They argued Smith's conclusion regarding the use of force was based on an inadmissible legal conclusion. The court granted the motion. It reasoned Smith's testimony was (1) a legal conclusion within the jury's purview; (2) speculative; (3) not outside the jury's common experience; and (4) under Evidence Code section 352, of slight probative value that was "substantially outweighed by . . . the probability of its admission . . . necessitat[ing] an undue consumption of time and creat[ing] a substantial danger of undue prejudice and confusion for the jury."

DISCUSSION

Howard contends the court abused its discretion by excluding Smith's testimony, which, as Howard summarizes it, would have described the training, policies and underlying reasons for law enforcement requirements concerning consensual encounters,

5

detentions and arrests, as well as the proper use of force. Howard maintains the testimony would have aided the jury in finding that Deputy Roysdon had failed to comply with accepted standards and procedures for detaining a suspect and using appropriate force, and would undermine the prosecution's claim that he must have known Deputy Roysdon was engaging in the performance of his lawful duties. More specifically, Howard argues the information provided by Smith was beyond the knowledge of the typical juror; Smith's testimony was not unduly speculative as it was based on the complaint, preliminary hearing transcript, Roysdon's arrest report, and Smith's extensive experience; Smith did not misstate the law, as he stated his conclusions were based on the fact Howard was not told he was being detained or under arrest, and the detention or arrest was not consistent with the deputies' training; Smith would not have been rendering a legal conclusion or invading the jury's purview as experts are permitted to give testimony embracing the ultimate issue and Smith was not merely testifying to the lawfulness of Deputy Roysdon's performance of his duty; and the probative value of Smith's testimony was significant, as evidence of training and standard for performing an officer's duties was relevant to the jury's determination that Deputy Roysdon was engaged in the lawful performance of his duties, as well as whether Howard's reaction was that of a reasonable person in a similar situation. On the latter point, Howard maintains the court's discretion under Evidence Code section 352 must yield to his constitutional right to present relevant evidence in his case, and because the court completely excluded his only affirmative evidence, it denied him his fundamental right to present a complete defense.

6

Following the filing of Howard's opening brief in this matter, the Court of Appeal decided *People v. Brown*, *supra*, 245 Cal.App.4th 140, which addressed the admission of police expert testimony in the context of the defendant's criminal prosecution for using force or violence to resist an executive officer. *Brown* held that the trial court in that case prejudicially erred by permitting the prosecution to present an expert police sergeant witness on, among other issues, "police officer 'defensive tactics,' " the police's legal authority to use reasonable force, the meaning of reasonable force, and the particular police department's procedures and officer training. (*Id*. at pp. 148-149, 156-172.) We asked the parties to brief *Brown*'s impact, if any, and address their arguments below.

I. *Legal Principles and Standard of Review Relating to Relevance of Evidence and Admission of Expert Testimony*

A. *Relevance*

Our Supreme Court has summarized the principles of relevance: " ' "Only relevant evidence is admissible [citations], and, except as otherwise provided by statute, all relevant evidence is admissible [citations]." [Citation.] "Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" [Citation.] [¶] . . .' [Citation.] '[T]he trial court has broad discretion to determine the relevance of evidence.' [Citation.] This discretion extends to evidentiary rulings made pursuant to Evidence Code section 352." (*People v. Tully* (2012) 54 Cal.4th 952, 1010;

7

see also *People v. Merriman* (2014) 60 Cal.4th 1, 74.)  Under Evidence Code section 352, trial courts have discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352; *People v. Masters* (2016) 62 Cal.4th 1019, 1062.)  The term "prejudice" used in the Evidence Code " 'refers to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual, and has little to do with the legal issues raised in the trial.' "  (*Masters*, at p. 1062.)

Appellate courts review trial court rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion.  (*People v. Merriman*, *supra*, 60 Cal.4th at p. 74.)  "We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' "  (*Ibid*.)

B.  *Expert Opinion Testimony*

As a general rule, an expert may give testimony in the form of an opinion only if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."  (Evid. Code, § 801, subd. (a); *People v. Sandoval* (2015) 62 Cal.4th 394, 414-415; see *People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1110.)  Additionally, otherwise admissible expert opinion testimony "is not objectionable because it embraces the ultimate issue to be decided by the trier of fact."  (Evid. Code, § 805; *People v. Prunty* (2015) 62 Cal.4th 59, 89.)

8

However, in cases " ' " '[w]here the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates.' " ' " (*Burton v. Sanner* (2012) 207 Cal.App.4th 12, 19.) Thus, "[e]xpert testimony will be excluded ' " 'when it would add *nothing at all* to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men [and women] of ordinary education could reach a conclusion as intelligently as the witness." ' " ' " (*Ibid.*, italics added; see *People v. Jones* (2012) 54 Cal.4th 1, 60; *People v. Dejourney*, *supra*, 192 Cal.App.4th at p. 1110.)

We likewise review for abuse of discretion the trial court's decision on whether a particular subject is a proper one for expert opinion. (*People v. Dejourney*, *supra*, 192 Cal.App.4th at p. 1110; see *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.] But the court's discretion is not unlimited, especially when . . . its exercise implicates a party's ability to present its case. Rather, it must be exercised within the confines of the applicable legal principles." (*Sargon*, at p. 773.)

II. *The Section 69 Offense and Constitutional Standards Governing a Law Enforcement Officer's Use of Excessive Force*

In assessing the trial court's ruling as to the probative value and nature of Smith's proffered testimony, it is necessary to outline the section 69 offense, as well as the constitutional standards governing a law enforcement officer's use of force when effectuating an arrest, investigatory stop, or other "seizure" under the Fourth Amendment.

9

Section 69 punishes those "who attempt[], by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resist[], by the use of force or violence, such officer, in the performance of his duty . . . ."  The California Supreme Court has explained that "section 69 'sets forth two separate ways in which an offense can be committed.  The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is resisting by force or violence an officer in the performance of his or her duty.' " (*People v. Smith* (2013) 57 Cal.4th 232, 240.)  "The second way of violating section 69 expressly requires that the defendant resist the officer 'by the use of force or violence,' and it further requires that the officer was acting lawfully at the time of the offense." (*Id*. at p. 241.)

Thus, a defendant cannot be convicted of a section 69 offense against an officer engaged in the performance of his or her duties unless the officer was acting lawfully at the time the offense was committed against the officer.  (*In re Manuel G.* (1997) 16 Cal.4th 805, 815.)  " 'The rule flows from the premise that because an officer has no duty to take illegal action, he or she is not engaged in "duties," for purposes of an offense defined in such terms, if the officer's conduct is unlawful . . . .  [¶]  . . .  [T]he lawfulness of the victim's conduct forms part of the corpus delicti of the offense.' " (*Id*. at p. 816; see *People v. Cruz* (2008) 44 Cal.4th 636, 673.)  "[W]here excessive force is used in making what otherwise is a technically lawful arrest, the arrest becomes unlawful and a defendant may not be convicted of an offense which requires the officer to be engaged in the performance of his duties." (*People v. White* (1980) 101 Cal.App.3d 161, 164; see also

10

*People v. Delahoussaye* (1989) 213 Cal.App.3d 1, 7 ["A peace officer is not 'engaged in the performance of his or her duties' . . . if he arrests a person unlawfully or uses excessive force in making the arrest"].)

"The Fourth Amendment's prohibition on 'unreasonable . . . seizures' protects individuals from excessive force in the context of an arrest or seizure." (*Thompson v. County of Los Angeles* (2006) 142 Cal.App.4th 154, 164, quoting U.S. Const., 4th Amend.; see *Graham v. Connor* (1989) 490 U.S. 386, 394 (*Graham*).) Claims that an officer used an excessive amount of force during an arrest or seizure are analyzed under the "objective reasonableness" standard of the Fourth Amendment. (*Graham*, at p. 395; *Thompson*, at p. 164.) Whether an officer acted reasonably in a particular use of force to effect a seizure "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (*Graham*, at p. 396; see *Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 527.) This determination "requires a careful balancing of ' "the nature and quality of the intrusion on the individual's Fourth Amendment interests" ' against the countervailing governmental interests at stake. [Citation.] Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. [Citation.] Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' [citation], however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

11

officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." (*Graham*, at p. 396.) "In calculating whether the amount of force was excessive, the trier of fact must recognize that peace officers are often forced to make split-second judgments, in tense circumstances, concerning the amount of force required." (*Brown v. Ransweiler*, at p. 528.)

### III. *People v. Brown*

In *People v. Brown*, a case of first impression, the court addressed the admissibility of use-of-force expert testimony where a criminal defendant defends against a charge of resisting arrest by claiming an unlawful arrest due to excessive force. (*People v. Brown*, *supra*, 245 Cal.App.4th at pp. 157, 163.) Brown, a 67-year-old African-American male, was riding his bicycle on the sidewalk when a Richmond police officer stopped him for wearing earphones and not having a light. (*Id.* at p. 146.) When Brown attempted to flee, two officers pursued and cornered him in a parking lot where they proceeded to use physical force to arrest him.[5] (*Ibid.*) Brown suffered a fractured rib and knots on his head. (*Ibid.*) During the criminal trial for resisting arrest among other offenses, the trial court permitted the prosecution to present testimony from a Richmond

---

5      The officers' and Brown's accounts differed. According to the officers, when Brown refused to stop, they tackled him and took him to the ground, and one officer used his fist to hit Brown in the torso area, but when Brown continued to swing, another officer delivered a strike with his knee to Brown's torso and two strikes with his fist to the side of Brown's head. (*People v. Brown*, *supra*, 245 Cal.App.4th at p. 146.) According to Brown, after he had fallen from his bicycle and was face down on the ground, one officer dove on his back with enormous force, then unprovoked, slugged him in the head three times. (*Id*. at p. 147.) Brown denied swinging at either officer. (*Ibid*.)

Police Department (Department) sergeant, who testified about police officers' legal authority to use reasonable force; the concept of "reasonable force" as defined by the United States Supreme Court, and the " 'general gist' of what reasonable force means . . . ." (*Id.* at p. 148.) The sergeant testified about the factors affecting an officer's decision about what force to use, and the Department's employment of a " 'use of force continuum' " to teach law officers how to respond to a suspect's level of resistance. (*Ibid.*) The sergeant also outlined other important considerations for an officer facing resistance; discussed the type of tools officers carried as well as their being taught to use " 'personal weapons' " such as hands, forearms, elbows, knees and feet; and what tools were appropriate for different levels of force. (*Ibid.*) Finally, addressing a hypothetical situation in which a suspect used a closed fist to swing at an officer, the sergeant testified as to how officers were trained for such a situation. (*Id*. at pp. 148-149.)

In addressing the defendant's claim of erroneous admission of the sergeant's testimony on excessive force, the *Brown* court used as an "entry point" the leading California case on the question in a civil context: *Allgoewer v. City of Tracy* (2012) 207 Cal.App.4th 755 (*Allgoewer*). (*People v. Brown*, *supra*, 245 Cal.App.4th at p. 158.) *Allgoewer* involved two police officers responding to a complaint that the defendant had violated a child custody order. (*Allgoewer*, at p. 758.) Upon arriving at the defendant's home, the officers engaged him in a conversation in his yard. (*Ibid.*) When the officers informed him of the child custody complaint, he became upset and picked up a hand rake he had been using to garden. (*Ibid.*) After the defendant refused to put the rake down, one of the officers performed a leg sweep, taking him to the ground, while the other

13

officer applied his Taser to the defendant twice. (*Id.* at pp. 758-759.) The defendant suffered a broken wrist, torn rotator cuff muscles, and a torn bicep as a result of the officers' use of force during his arrest. (*Id.* at p. 759.)

In the defendant's civil suit against the officers for using excessive force (*Allgoewer*, *supra*, 207 Cal.App.4th at p. 759), the trial court entered a nonsuit in the officers' favor on their argument that the defendant was required to present expert testimony as to police practice and procedures so as to "establish an objective reasonableness standard for the defendant officers' actions . . . ." (*Ibid*.) Because there was no California precedent on the issue, the appellate court looked to out-of-state authorities that confronted the admissibility of expert testimony on whether an officer's particular amount of force was objectively unreasonable. (*Allgoewer*, at p. 763.)[6]

---

6    In *Kopf v. Skyrm* (4th Cir. 1993) 993 F.2d 374, the Fourth Circuit Court of Appeals reversed the trial court's exclusion of the plaintiff's two expert witnesses who would have testified as to police training and standards of conduct for the use of a police dog and the use of slapjacks. (*Allgoewer*, *supra*, 207 Cal.App.4th at p. 763.) The Fourth Circuit rejected a blanket rule that expert testimony is generally admissible in an excessive force case and instead held that because the standards and procedures of using police dogs and slapjacks would not be common knowledge to a lay juror, the plaintiff's experts should have been allowed to testify. (*Ibid.*) In *Thompson v. City of Chicago* (7th Cir. 2006) 472 F.3d 444, police officers fatally employed a choke hold to arrest a suspect following a high-speed car chase. (*Allgoewer*, at p. 763.) The Seventh Circuit Court of Appeals affirmed the district court's exclusion of the plaintiffs' expert testimony, finding the jury to be in " 'as good a position as the experts to judge whether the force used by the officers to subdue [the suspect] was objectively reasonably given the circumstances in this case.' " (*Id.* at 764.) In *Robinson v. City of West Allis* (Wis. 2000) 619 N.W.2d 692, the Wisconsin Supreme Court also rejected a categorical requirement for expert testimony " 'to determine whether a reasonable use of force in effectuating an arrest includes smashing an arrestee's face to the ground or landing a punch to the side of his head.' " (*Allgoewer*, at p. 765.) In part, *Robinson* reasoned that " 'determinations of excessive use of force are not, in general, beyond the realm of ordinary experience and

14

Adopting the analysis of the Wisconsin Supreme Court in *Robinson v. City of West Allis*, *supra*, 619 N.W.2d 692, the *Allgoewer* court reversed the judgment of dismissal, concluding the court had erred by concluding expert opinion was required: "[T]here is nothing about the particular use of force in this case that was so far removed from the comprehension of a lay jury as to necessitate expert opinion testimony on the applicable standard of conduct or on what amount of force was reasonable under the circumstances that confronted the officers who arrested [the defendant]." (*Id.* at pp. 765-766.)

The *Brown* court observed that the precise legal question in *Allgoewer* and *Robinson* (whether expert testimony was mandatory versus whether it is admissible) was based on a significantly different standard, but it nevertheless found those cases and others instructive in that they "all view[ed] the utility of expert testimony in civil excessive force cases through a common frame of reference." (*People v. Brown*, 245 Cal.App.4th at p. 163.) *Brown* explained: "Within that frame, the correct analysis is case by case and very much dependent on the particular facts presented, but in general, where only bodily force is used, the less likely it will be that an excessive force expert will add something to the common store of knowledge that every jury brings to its task. Since the ultimate issue for a jury to decide under *Graham*[, *supra*, 490 U.S. 386] is whether the

lay comprehension' " and " '[r]equiring an expert as a prerequisite to a finding of use of excessive force would essentially remove from the jury the task of applying standards of reasonableness and replace it with the task of evaluating the testimony of the parties' experts.' " (*Allgoewer*, at pp. 764, 765, quoting *Robinson*, at pp. 695, 699, 700.) The *Robinson* court explained that the facts of each case should dictate whether expert testimony was necessary, and " '[w]hile there may be cases in which the subtleties of police procedure and practice justifying a particular use of force are so far removed from the comprehension of a lay jury as to necessitate an expert, this is not one of them.' " (*Allgoewer*, at p. 765, quoting *Robinson*, at p. 700.)

15

challenged conduct is objectively reasonable, the training of particular officers—which focuses subjectively on how *they* were predisposed to handle the situation they faced—is, at best, only marginally relevant. What counts is whether a reasonable officer, faced with the same set of circumstances, would have chosen the same course of action. . . . [E]ven where an expert does not address the ultimate issue for decision by a jury, legal guidance on what constitutes objectively reasonable conduct must come from the trial judge, not from the expert." (*Brown*, 245 Cal.App.4th at pp. 163-164.)

The *Brown* court concluded that under the circumstances of its case, the sergeant's testimony should have been excluded because it added nothing to the common fund of information any juror would have brought to the jury room and inaccurately addressed the governing law, and thus the expert "in essence, invited the jury to abdicate its duty to decide the issue of excessive force based on an erroneous understanding of the law." (*People v. Brown*, *supra*, 245 Cal.App.4th at pp. 164-165.) It held that specialized knowledge was not required for the jury, because the officers "used 'force . . . reduced to its most primitive form—the bare hands' " (*id*. at p. 165) and there was no need to explain any use of a specialized law enforcement tool such as a gun, dog, Taser, Mace or pepper spray. (*Ibid*.) *Brown* emphasized the importance that the jury apply a reasonableness standard using its common knowledge under *Graham*'s test, which was highly situational and fact specific, requiring the jury to "apply its own independent sense of reasonableness, using whatever community norms jury members might bring to the issue." (*Brown*, at p. 166.)

16

*Brown* further observed that embedded in the sergeant's testimony was an explanation of the governing law, and an improperly truncated explanation of *Graham*, *supra*, 490 U.S. 386, in part because the sergeant never mentioned that the test was an objective one. (*People v. Brown*, *supra*, 245 Cal.App.4th at p. 166.) Because the jury instructions did not address *Graham* or give the jury criteria to use in distinguishing "reasonable" from "excessive" force, the expert "supplied the jury's only legal guidance on this crucial issue" (*Brown*, at p. 167) though he was not qualified to do so. (*Id*. at p. 168.) The court stated it was for the prosecutor to request special jury instructions on the *Graham* factors and elaborate on them in closing argument. (*Ibid*.)

Finally, *Brown* agreed with the defendant's position that the true purpose of the sergeant's testimony was not to educate the jury about control techniques, but to suggest that because the officers conducted themselves in accordance with legally sanctioned training, their actions were within the bounds of the law. (*People v. Brown*, *supra*, 245 Cal.App.4th at p. 169.) "Reasonableness for Fourth Amendment purposes was for the jury to decide based on the facts of Brown's encounter with [the officers], not by using the officers' training as a proxy for it." (*Id*. at p. 170.) The court pointed out that in a civil case, the scope of relevant subject matter for a claim of excessive force tends to be broader, and that because the Fourth Amendment "focuses more narrowly on the moment force is used than state tort law does [citation], . . . officer training and tactics can potentially be relevant for purposes of tort liability, where it is not for Fourth Amendment purposes." (*Id*. at pp. 170-171.) The *Brown* court adopted the Seventh Circuit's conclusion that police rules, practices and regulations were " 'an unreliable gauge by

17

which to measure the objectivity and/or reasonableness of police conduct' under the Fourth Amendment." (*Id*. at pp. 171-172.)

## IV. *Analysis*

We are persuaded by *People v. Brown*'s reasoning. That is, we reject the notion that expert testimony is per se required on the reasonableness of an officer's use of excessive force where a defendant seeks to prove the unlawfulness of the officer's actions. (*People v. Brown*, *supra*, 245 Cal.App.4th at p. 163.) The court must determine whether to exclude or admit expert testimony regarding this issue on a case-by-case basis, dependent on the particular facts presented, and by analyzing what degree or type of force was used. At one end of the spectrum, where an officer uses physical or bodily force, expert testimony will less likely add something to the jury's common knowledge, and the court may use its discretion to exclude the testimony accordingly. At the other end of the spectrum, where an officer uses complex or sophisticated tools, procedures, and training methods, expert testimony will more likely add something beyond the common knowledge of the jury.

Here, the trial court did not abuse its discretion when it excluded Smith's proffered testimony. In their attempts to restrain Howard, Deputy Roysdon used his body weight and arms in a hug, Ferrante applied his knee to Howard's legs and used his hands to try to control Howard's arms, and Deputy Sanchez likewise used his knee at the top of Howard's shoulders. Under the circumstances, as in *Brown*, there was no need for Smith to explain the "proper handling of some specialized law enforcement tool . . . ." (*People v. Brown*, *supra*, 245 Cal.App.4th at p. 165.) As *Brown* stated: "Nor was it a matter of

18

specialized knowledge that two officers are more effective than one; that a second officer may come to the aid of another officer who is having trouble subduing a suspect; or that, to gain control over a resisting suspect, law enforcement officers are permitted to use their hands, fists, knees, feet or other body parts. The question here was not whether two officers could join in the pursuit of Brown or use bodily force against him, but whether they went overboard when they caught him. On this crucial question of proportionality, technical jargon ('pain compliance,' 'personal weapons,' 'control techniques') and truisms about the amount of force officers may use (enough to ensure that their target cannot engage them in 'a fair fight') add nothing to the everyday understanding anyone would bring to the jury room." (*Ibid*.) In this case, as in *Brown*, the jury was to use its common knowledge and "independent sense of reasonableness" under community norms in assessing the reasonableness standard. (*Id*. at p. 166.)

Nor would it have been proper for Smith to testify about the deputies' legally sanctioned training and whether Deputy Roysdon had complied with it, which would have placed before the jury a "line of inquiry that was potentially distracting and confusing." (*Brown*, *supra*, 245 Cal.App.4th at p. 165.) Again, reasonableness of the deputies' conduct for Fourth Amendment purposes was for the jury to decide based on the facts of Howard's encounter with Deputy Roysdon and the others, not by using their training as a proxy for it (*id*. at pp. 170-171), and thus such training was irrelevant: " 'an unreliable gauge by which to measure the objectivity and/or reasonableness of police conduct' under the Fourth Amendment." (*Id*. at p. 172.)

19

Howard correctly notes that the applicable standard is that of objective reasonableness, and he cites *People v. Brown* for its summary of the law relating to admission of expert testimony. He also agrees that the reasonableness of the amount and type of force was for the jury to determine. However, he urges us to disregard *People v. Brown* on grounds the facts here are "significantly different" from those in that case.

We are unpersuaded. Howard states that his expert Smith would have given "information on police procedures as to how to provide a suspect with notice that he or she is being detained and/or arrested, as well as the appropriate use of force in making such seizures." According to Howard, Smith was not intending to testify on his subjective beliefs as to the use of force, use the officers' training as a proxy for reasonableness, or give legal conclusions, as did the sergeant expert in *Brown*. Howard maintains the jury's assessment of both reasonableness as to the officers' use of force, and their notice of whether a detention or arrest was occurring, "would have been aided by [Smith's] testimony . . . in police training and the reasons for requiring certain actions." Howard argues, citing *Tennessee v. Garner* (1985) 471 U.S. 1, that established practices and procedures are evidence by which the reasonableness of an officer's behavior may be assessed.

We see little difference between Smith's proffered testimony as set forth in his report, and that of the expert in *People v. Brown*, including Smith's conclusion that the deputies' force was not "legally applied" in view of their training. Smith's discussion of police procedures and training would have invited the jury to use those standards to assess the deputies' subjective beliefs in the reasonableness of their use of force, rather

20

than apply an objective standard. As for Howard's claims about the need for Smith's testimony concerning the *nature* of his detention, under the court's instructions (CALCRIM No. 2652),[7] the question for the jury was whether the deputies used excessive force *at the moment Howard resisted*. (See *Graham*, *supra*, 490 U.S. at pp. 396-397 [on claim of excessive force, the standard of reasonableness at the moment applies].) Finally, as for Howard's latter point, *Tennessee v. Garner* is inapposite, as it involved a civil rights claim (42 U.S.C. § 1983) in an entirely different scenario: an officer's application of *deadly force* against a "young, slight, and unarmed" burglary suspect (*Tennessee v. Garner*, *supra*, 471 U.S. at p. 21) by shooting him in the back of the head while he was running away on foot. (*Id*. at p. 4; see *Brosseau v. Haugen* (2004) 543 U.S. 194, 203 ["Unlike most 'excessive force' cases in which the degree of permissible force varies widely from case to case, the only issue in a 'deadly force' case is whether the facts apparent to the officer justify a decision to kill a suspect in order to prevent his escape"].)

Howard also asserts in his supplemental briefing that in *People v. Brown*, there was no indication that a "prosecution witness had already testified to his views of the legality of his actions." This repeats an argument Howard made in his opening brief: that

---

7    As read to the jury, CALCRIM No. 2652 provided in part:  "The defendant is charged in count 1 with resisting an executive officer in the performance of that officer's duty in violation of Penal Code section 69.  [¶]  To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant unlawfully used force or violence to resist an executive officer;  [¶]  Two, when the defendant acted, the officer was performing his lawful duty;  [¶]  and three, when the defendant acted, he knew the executive officer was performing his duty."

Smith's testimony would have countered Deputy Roysdon's testimony that he intended to detain Howard when he contacted him, as well as his purported explanation of standards of reasonableness used in detentions, and Smith would have "added information as to how law enforcement officers are trained in San Diego." Howard argues that to disallow Smith's testimony on a basis "not deemed disqualifying when prosecution witnesses are involved, amounts to unequal application of evidentiary rules in violation of [his] due process rights . . . ." We observe that it was *defense counsel* who began this line of questioning with Deputy Roysdon on cross-examination. In our view, any error predicated on Deputy Roysdon's testimony in this respect was invited by Howard. (*People v. Perez* (1979) 23 Cal.3d 545, 549-550, fn. 3 ["The doctrine of invited error applies to estop a party from asserting an error when 'his own conduct *induces the commission of error*"].) But setting that aside, as we have pointed out, the jury's focus is not the moment of initial stop or detention, but the reasonableness of the use of force applied when Howard was resisting, after he had already fled from Deputy Roysdon.

As for Howard's claim that the trial court's ruling stripped him of his right to present a defense, we observe that application of the ordinary rules of evidence " ' "do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense." ' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1202; see also *People v. Edwards* (2013) 57 Cal.4th 658, 728.) " ' "Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." ' " (*People v. Lawley* (2002) 27 Cal.4th 102, 155.) Howard chose not to present witnesses in his defense at trial. He was not

22

precluded from attempting to demonstrate the officers' use of force was excessive and their actions thereby unlawful, he was merely properly precluded from proving it with expert testimony that was not probative on the question.

## DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

NARES, J.

23